Filed 6/15/22  P. v. Noujaim CA4/2
See Dissenting Opinion

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076514 |
| v. | (Super.Ct.No. RIF2001208) |
| RUBEN G. NOUJAIM, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Louis R. Hanoian, Judge. (Retired Judge of the San Diego Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Reversed with directions.

James M. Kehoe, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

1

On September 10, 2019, a vehicle driven by defendant Ruben G. Noujaim struck and killed a pedestrian. A blood test revealed Noujaim had recently used heroin. Less than seven months after the fatal collision, on April 7, 2020, Noujaim was stopped for driving erratically at unsafe speeds, running red lights, and making unsafe turns; a blood test again indicated recent heroin use. A jury convicted Noujaim of vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (b); count 1) and driving under the influence of a drug causing injury (Veh. Code, § 23153, subd. (f); count 2) and found true a sentencing enhancement for great bodily injury (Pen. Code, §§ 12022.7, subd. (a) & 1192.7, subd. (c)(8)) based on the September 2019 collision. Noujaim pleaded guilty to one misdemeanor count of driving under the influence (DUI) of a drug (Veh. Code, § 23152, subd. (f); count 3) based on the April 2020 stop.

Noujaim challenges the denial of his motion to suppress evidence obtained through a warrantless blood draw. (Pen. Code, § 1538.5.) The trial court found exigent circumstances justified taking Noujaim's blood sample without a warrant. We disagree and reverse.

## BACKGROUND

Because Noujaim challenges only the denial of the motion to suppress, we do not recount in detail the evidence introduced at trial and instead focus on the facts presented at the hearing on the suppression motion.

Deputy Damian Chavez of the Riverside County Sheriff's Department was on duty as a motorcycle traffic officer on September 10, 2019, at 7:45 p.m. when he

2

responded to a vehicle versus pedestrian collision near the intersection of Graham Street and Old Valley Road in Moreno Valley, arriving at 7:52-7:56 p.m. As he approached the scene, Chavez saw emergency medical personnel arriving and providing assistance to a person lying in the roadway, and a small crowd of people was gathering on the sidewalks. Chavez conferred with Deputy Aurelian Perde, who had arrived earlier, and they determined that Chavez would act as the primary deputy responsible for the investigation. Perde had already determined that Noujaim was driving the car that had struck the pedestrian, and he had located two possible witnesses. Perde interviewed the first witness while Chavez assigned other deputies to shut off traffic on both roadways and to secure the accident scene to prevent anyone from entering. Chavez then interviewed Noujaim, who was pacing, seemed to be crying, and was too distraught and emotional to speak. Chavez asked Noujaim to stay there and regain his composure while Chavez went to take a statement from another witness and deal with some bystanders who were asking questions. Meanwhile, other traffic bureau deputies and traffic supervisors had been called in to assist with the investigation, and it was Chavez's responsibility to keep them updated as the investigation progressed, to get reports from other officers assisting with the investigation, to delegate tasks to other deputies, and to manage bystanders who had gathered and occasionally interrupted the investigation. At its peak, the investigation required all available deputies to be on the scene participating until all necessary tasks had been assigned, which Chavez estimated occupied between 10 and 15 deputies in all, including community service officers who had been called in.

After the pedestrian was declared dead at the scene, Chavez returned to interview Noujaim. Noujaim had stopped crying, appeared more composed, and was able to provide information about what had happened. Chavez observed Noujaim's eyes were glossy and his pupils appeared constricted, indicating he might be under the influence, and Chavez proceeded to ask a series of pre-field-sobriety-test questions to investigate Noujaim's possible impairment. Noujaim reported that he was taking painkillers, both prescription and over-the-counter, and that he had suffered a head injury and partial blindness in his right eye from a previous car accident and assault. Chavez noticed inconsistencies in Noujaim's responses concerning the medications he had taken that day, so he decided to administer field sobriety tests. On the horizontal gaze nystagmus test, Chavez noticed that Noujaim's eyes were glossy and his pupils appeared to be "pinpoint." While Chavez was giving instructions for the walk-and-turn test, Noujaim became unstable and could not maintain his position without losing his balance, so Chavez discontinued that test. On the one-leg-stand test, Noujaim was unable to straighten his legs, put his leg down repeatedly, used his arms for balance, and was unable to lift his leg again without losing his balance, all of which indicated possible impairment to Chavez. Chavez noticed another inconsistency in Noujaim's statements: He claimed he was unable to complete the tests because he was in pain, but during the interview before the field sobriety tests, Noujaim had spontaneously told Chavez that he would be able to perform the tests because he was pain free today. At this point, Chavez formed an opinion that Noujaim may have been under the influence of painkillers and

4

may have been impaired and unable to operate a motor vehicle safely, so he placed Noujaim under arrest.

Chavez estimated that he arrested Noujaim "somewhere around 9:00" p.m., which "had to have been well over an hour" after Chavez had arrived at the scene. A forensic nurse had already been called to the scene by another deputy around 8:30 or 8:40 p.m. in case Noujaim consented to provide a blood sample, and Chavez saw the blood nurse arrive at 9:07 p.m. Chavez asked Noujaim several times to provide a blood sample for testing, but Noujaim refused, asking instead that Chavez continue administering the field sobriety tests.

At 9:13 p.m., Deputy Kevin Seguin arrived at the scene. By that time, the number of deputies involved in the investigation had dwindled from its peak of 10-15. Because the investigation was still ongoing and Chavez was unable to transport Noujaim on his motorcycle, he told Seguin to transport Noujaim to the station, which was between five and 10 minutes away, and obtain a search warrant to conduct a blood draw.

Chavez testified that at the time of this collision, the Riverside County Sheriff had not yet implemented its new tablet computer system allowing deputies to apply for search warrants from the field, so deputies had to go to the station to use the computers, printers, and scanners to author a warrant application, print it, sign it, scan it, email it to a magistrate on call, then wait for a response, and follow up with a telephonic sworn oath. Accordingly, Chavez provided to Seguin all of the facts he had ascertained from his investigation establishing probable cause so Seguin could include that information in the

5

search warrant application. Seguin then left to transport Noujaim to the station, and the blood nurse at the scene was also asked to proceed to the station.

Seguin testified that he was called in on his day off to assist with a fatal traffic collision investigation and arrived at the accident scene at 9:13 p.m. that day. There, Chavez informed him that Noujaim had been arrested, that Chavez believed Noujaim was impaired by drugs, and that Noujaim had declined consent for a blood test, and Chavez asked Seguin to transport Noujaim to the station and assist with obtaining a warrant and blood draw. While they were driving to the station, Noujaim asked Seguin what was going on. Seguin requested Noujaim's consent for a blood test, which Noujaim refused, so Seguin told Noujaim he would obtain a search warrant for the blood test. After arriving at the station around 9:30 p.m., Seguin saw that the phlebotomist was already there, and he again asked for Noujaim's consent for a blood test, which Noujaim refused. Seguin instructed the nurse to draw Noujaim's blood, which Seguin witnessed, and two samples were taken and marked to indicate they were drawn at 9:49 p.m. and 9:50 p.m.

When asked why he had ordered Noujaim's blood to be drawn without first obtaining a search warrant, Seguin explained that almost two hours had already elapsed since the collision, and in his experience, it takes roughly an additional hour to author a warrant application and get it approved. He explained that the more time that passes causes the substances in the blood to dissipate, that the need to preserve evidence after a fatality collision was great, and that sometimes securing an after-hours search warrant can take longer than one hour. Seguin testified that immediately after witnessing

6

Noujaim's blood draws, he authored and submitted a warrant application, which was approved at 10:43 p.m.

On cross examination, defense counsel asked Seguin, "after Mr. Noujaim elected not to take a blood test, you thought about getting a search warrant, right?" He responded, "Yeah. That was the next step. When a person refuses, we write a search warrant." Seguin testified that it usually took him 20-30 minutes to draft and submit a DUI blood draw warrant application, but he did not do so in the time between his arrival at the station around 9:31 p.m. and the blood draws at 9:49 and 9:50 p.m. Seguin acknowledged that in the warrant application he submitted after the blood draws, he omitted the fact that Noujaim's blood samples had already been taken. He confirmed that he had drafted and submitted the application and obtained the search warrant within 53 minutes after the blood draws. Seguin also acknowledged his awareness that blood could be drawn for purposes of alcohol testing up to three hours after a DUI incident.[1]

---

[1] In discussing the three-hour timeframe for drawing blood samples after a DUI incident, counsel and the trial court repeatedly referred to Title 17 of the California Code of Regulations, which establishes standards for forensic alcohol testing. The record references to Title 17 are unclear because those regulations do not mention a three-hour blood draw period but instead provide that "[b]lood samples shall be collected by venipuncture from living individuals *as soon as feasible after an alleged offense . . . .*" (Cal. Code Regs., tit. 17, § 1219.1, subd. (a), italics added.) Vehicle Code section 23152, subdivision (b), on the other hand, does provide for a rebuttable presumption that a defendant was driving with a blood alcohol content of at least 0.08 if a chemical test "within three hours after the driving" yields a result of at least 0.08. (Veh. Code, § 23152, subd. (b); see *Coffey v. Shiomoto* (2015) 60 Cal.4th 1198, 1208-1210.) In any event, both Title 17 and Vehicle Code section 23152 apply only to blood alcohol tests, not to the drug testing at issue here.

After hearing argument from both sides, the trial court first noted that "there was a lot going on" and Chavez was busy with the investigation, administering field sobriety tests, and conducting interviews. The court acknowledged that it could not determine from the testimony whether there was "an opportunity for a different officer to transport the defendant to the station . . . prior to Seguin's arrival." Nevertheless, the court found that by the time Seguin took Noujaim to the station, his concern about the loss of evidence was heightened because he knew "the longer you delay taking blood, the less reliable the blood test is going to be," and at that point they "were coming up on the two-hour mark from when the original accident was called in." The court credited Seguin's testimony that obtaining a search warrant at that time of night typically "takes about an hour, more or less." Although the court acknowledged that Seguin still could have obtained a warrant and taken a blood sample within three hours of the collision, "that does not alleviate the concerns" that the delay would render the blood test unreliable. The court remarked that Seguin's decision to obtain a search warrant after the blood draw had already been completed was "unusual" and "something I have never seen," although "I understand why they would do it to just establish and confirm that a magistrate would determine that there was probable cause for the warrant with the facts given to him as known at the time." The court denied Noujaim's motion to suppress, concluding that there was probable cause for the blood draw, that exigent circumstances justified taking the blood without a warrant at the time it was taken, and that the exigency was not the result of law enforcement delay.

STANDARD OF REVIEW

"As the finder of fact in a proceeding to suppress evidence [citation], the superior court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally unreasonable." (*People v. Woods* (1999) 21 Cal.4th 668, 673.) "But while we defer to the superior court's express and implied factual findings if they are supported by substantial evidence, we exercise our independent judgment in determining the legality of a search on the facts so found." (*Id*. at pp. 673-674.) Substantively, "we review challenges to the admissibility of evidence obtained by police searches and seizures under federal constitutional standards." (*Id*. at p. 674.)

DISCUSSION

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.) Searches conducted without a warrant are presumptively unreasonable under the Fourth Amendment, "subject only to a few specifically established and well-delineated exceptions." (*Katz v. United States* (1967) 389 U.S. 347, 357.) One such "exception applies when '"the exigencies of the situation" make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'" (*Kentucky v. King* (2011) 563

9

U.S. 452, 460.) Exigent circumstances have been found to justify warrantless searches when law enforcement must act urgently to render emergency assistance, to stop a suspect from fleeing, or to prevent the imminent destruction of evidence. (*Ibid*.)

The U.S. Supreme Court determined in *Schmerber v. California* (1966) 384 U.S. 757 (*Schmerber*), that compulsory administration of a blood test constitutes a search under the Fourth Amendment for which law enforcement must normally obtain a warrant. The court determined, however, that the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'" (*Id*. at p. 770.) Because "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system," and "time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant." (*Id*. at pp. 770-771.) Under the "special facts" presented in *Schmerber*, the court found no Fourth Amendment violation but emphasized that it "reach[ed] this judgment only on the facts of the present record." (*Id*. at pp. 771-772.)

In *Missouri v. McNeely* (2013) 569 U.S. 141 (*McNeely*), the Supreme Court declined to adopt a categorical rule that the natural dissipation of alcohol in the bloodstream constitutes an exigency excusing the warrant requirement in every DUI case, and the court instead held that whether "a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the

circumstances." (*Id*. at p. 156.) "In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." (*Id*. at p. 152.)

*Mitchell v. Wisconsin* reaffirmed that the evanescent nature of blood evidence does "not permit a warrantless blood draw in *every* drunk-driving case" and that a claim of exigent circumstances "requires a '"totality of the circumstances"' analysis." (*Mitchell v. Wisconsin* (2019) __ U.S. __, 139 S.Ct. 2525, 2536 & fn. 3 (plur. opn. of Alito, J.).) Because DUI investigations may present law enforcement officers with "a slew of urgent tasks," such as preserving and documenting evidence at the scene of a crash, safely redirecting traffic to prevent additional accidents, attending to injuries requiring emergency medical care, and dealing with fatalities, the relevant inquiry focuses on whether such "critical health and safety needs" reasonably require "delaying the warrant application, and thus the BAC [blood alcohol concentration] test, to the detriment of its evidentiary value." (*Id*. at p. 2538.) "Thus, exigency exists when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application." (*Id*. at p. 2537.)

"In response to a motion to suppress evidence seized in a warrantless search, the prosecution bears the burden to prove police conducted the search under a valid exception to the Fourth Amendment's warrant requirement." (*People v. Espino* (2016) 247 Cal.App.4th 746, 756.) "'"'"There is no ready litmus test for determining whether

11

[exigent] circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.'"'" (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1041.) "'"'As a general rule, the reasonableness of an officer's conduct is dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a man of reasonable caution in the belief that the action taken was appropriate. [Citation.] And in determining whether the officer acted reasonably, due weight must be given not to his unparticularized suspicions or 'hunches,' but to the reasonable inferences which he is entitled to draw from the facts in the light of his experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his action was necessary.'"'" (*Id*. at p. 1043.)

Applying these principles to the instant case, we must determine if the People have established that the officers here were faced with such pressing health, safety, or law enforcement needs that they reasonably believed there was no time to obtain a warrant "without significantly undermining the efficacy of the search." (*McNeely*, *supra*, 569 U.S. at p. 152.) The People have not carried that burden here. Although the People point out that Chavez was in charge of a fatality accident investigation that required him to attend to other duties, that is why he enlisted Seguin to obtain the warrant. Chavez recounted to Seguin the factual basis establishing probable cause so Seguin could include those facts in the warrant application. (We note that nothing in the record explains why Chavez could not have radioed the station to have someone initiate the warrant application as soon as Noujaim declined to consent to the blood draw.) Seguin testified

12

that while driving from the accident scene to the station, he told Noujaim that a search warrant would be obtained for the blood test. Seguin testified that at that point in time, getting a warrant "was the next step." Moments later, upon arriving at the station, Seguin abruptly changed course and ordered Noujaim's blood drawn without a warrant, but he pointed to no specific and articulable facts from which he concluded his action was necessary, other than the general concern that "[t]he more time that passes causes the substances to dissipate." Nor did the People offer any other evidence establishing that it was reasonable to conclude that the time required to obtain a warrant would have rendered the test results unreliable.[2] We cannot conclude based on this record that the People carried their burden of establishing it was reasonable for Seguin to believe he faced an exigency demanding that he abandon the warrant application in order to preserve the reliability of the blood test evidence.

The People urge us to affirm the denial of the motion to suppress, relying on *People v. Toure* (2015) 232 Cal.App.4th 1096 (*Toure*). In that case, we found a warrantless blood draw was justified by exigent circumstances after an injury accident in

---

[2] At the preliminary hearing on May 11, 2020, forensic toxicologist Kristen Steward was asked how long heroin can be detected in blood tests, and she responded: "Heroin itself we do not test for because it breaks down very, very quickly. The monoacetylmorphine, which is the first metabolite of heroin . . . has what we call a half-life, which is the time it takes for half of the drug to leave the system. That half-life is 6 to 25 minutes, very quick. Morphine, which is the third [sic] metabolite, that's about a two, three hour half-life." She explained that monoacetylmorphine is rarely seen in blood test results because it breaks down so quickly and that its presence indicated that heroin must have been taken "within the last couple of hours." The People did not call Steward to testify at the hearing on defendant's motion to suppress and offered no evidence bearing on how long after the collision a blood draw would no longer provide reliable evidence of drug intoxication.

which the defendant refused to cooperate with the investigation and was violent and combative, requiring officers to "hogtie" him in restraints and preventing the administration of field sobriety tests. (*Id.* at p. 1104.) By the time officers had conducted a cursory investigation of the accident scene, subdued the defendant, and transported him to the station, two hours had elapsed since the accident. (*Ibid.*) At that point, the officers were faced with additional time pressure because the defendant was in restraints that needed to be removed as soon as possible. (*Ibid.*) Given the totality of the circumstances, including that the defendant's combativeness had significantly delayed the investigation and his refusal to provide information precluded calculating backwards to determine his blood alcohol content at the time of the accident, we found exigent circumstances justified the officers' decision to perform a warrantless blood draw to prevent destruction of the evidence. (*Id.* at p. 1105.) The People argue that, as in *Toure*, the investigation here was delayed by Noujaim, because his initial distraught demeanor delayed his interview and his physical limitations hindered the field sobriety tests, but the record does not establish that those factors resulted in any significant delay that would create exigent circumstances.

Here, unlike in *Toure*, the record does not establish there was insufficient time to secure a warrant and still obtain reliable blood test evidence. The deputies at least suspected they would need a blood sample from Noujaim by 8:30 or 8:40 p.m. when the forensic nurse was dispatched to the scene, and they had probable cause for a blood test warrant by the time Noujaim was arrested around 9:00 p.m. Even after Seguin arrived at

14

the scene at 9:13 p.m., Chavez did not believe there was insufficient time to obtain a search warrant and still procure reliable blood test evidence, and he enlisted Seguin's assistance for that very purpose.

The facts of this case more closely resemble those in *People v. Meza* (2018) 23 Cal.App.5th 604, where shortly after arriving at an accident scene, the officer conducting the intoxication investigation observed objective signs of intoxication and determined that the defendant should be arrested for driving under the influence. (*Id*. at pp. 606-607.) Rather than trying to get a search warrant, the officer ordered a warrantless blood draw after having spent time on tasks that could have been assigned to other officers or postponed until after a warrant application had been submitted. (*Id*. at pp. 611-612.) The court found no exigency existed because with reasonable diligence the officers could "have procured a warrant without causing any delay in the blood draw." (*Id*. at p. 612.)

Similarly here, the trial court observed that "the defendant was consistent in refusing to take a test or declining to take a test well before 9:07 when the phlebotomist arrived" and that the testimony failed to establish that there was no "opportunity for a different officer to transport the defendant to the station . . . prior to Seguin's arrival" at 9:13 p.m.[3] Moreover, as we have already noted, the People failed to explain why Chavez could not have called the station to request that another deputy begin the warrant

---

[3] According to the dissent, "[t]he record demonstrates there was no opportunity for another officer to transport defendant to the station until Seguin arrived." (Dis. opn., *post*, at p. 3.) That is contrary to the trial court's evaluation of the evidence. Having heard the relevant testimony, the trial court stated: "Now, was there an opportunity for a different officer to transport the defendant to the station prior to 9:20, 9:30? I don't know whether there was or not—I mean, prior to Seguin's arrival, I don't know."

15

application process before Seguin arrived.[4]  (See *McNeely*, *supra*, 569 U.S. at p. 154 [noting that where "the warrant process will not significantly increase the delay before the blood test is conducted because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer . . . , there would be no plausible justification for an exception to the warrant requirement"].)  The trial court also acknowledged that even after Seguin arrived at the station with Noujaim around 9:30 p.m., the additional hour he estimated it would have taken to obtain a warrant would still have allowed blood to be drawn within the three-hour guideline for reliable alcohol testing.[5]  The People proffered no evidence to explain why the warrant that Seguin had

---

[4] The dissent asserts that we are "speculat[ing]" that Chavez "had a half hour to spare at the accident scene to call the station to relay the information necessary for a warrant application and failed to act."  (Dis. opn., *post*, at p. 5.)  Seguin arrived at the accident scene at 9:13 p.m., was briefed by Chavez on all the facts needed for the warrant application, and delivered Noujaim to the station, which was five to 10 minutes from the accident scene, "around 9:30 p.m."  The evidence thus shows it took no more than around seven to 12 minutes to convey the information needed for the warrant application.  Chavez did not testify that he was too busy to take any steps to initiate the warrant application before Seguin arrived.  Rather, he testified that it did not occur to him to do so:  "The idea of the warrant did not come to mind until [Seguin] made it to the scene."  And even after Seguin arrived, nothing in the record explains why Chavez could not have conveyed the necessary information to the station at the same time he was talking to Seguin, so that the application could have been initiated while Seguin was en route with Noujaim.

[5] The dissent focuses on the difference between alcohol and opiates such as heroin, calling it "the elephant in the room."  (Dis. opn., *post*, at pp. 9-10.)  The People did not call a toxicologist to testify at the suppression hearing, and the information on which the dissent relies was not before the trial court at that hearing.  At the preliminary hearing, the prosecution's toxicologist testified that morphine, a metabolite of heroin, has "about a two, three hour half-life," meaning that two to three hours is "the time it takes for half of the drug to leave the system."  Had that testimony been introduced at the suppression hearing, it would have tended to undermine the claim of exigent

*[footnote continued on next page]*

16

been tasked with procuring just moments before had suddenly become an obstacle to obtaining reliable evidence. Based on the totality of the record, we conclude that the People failed to carry their burden to establish that exigent circumstances justified the warrantless blood draw here. Accordingly, we reverse the trial court's order denying Noujaim's motion to suppress the blood test evidence.

Because we reverse the order denying the motion to suppress, the two felony convictions based on the blood test evidence are vacated, and we need not address Noujaim's contention raised in his supplemental opening brief that his conviction for count 2, driving under the influence causing injury, and the enhancement for great bodily

---

circumstances. In the trial court and on appeal, the People have never argued that the difference between alcohol and opiates supports their showing of exigent circumstances.

The dissent also focuses on 6-acetylmorphine (6-AM), a metabolite that is specific to heroin. (Dis. opn., *post*, at pp. 7-8.) The dissent's discussion is irrelevant for several reasons. Although 6-AM has a very short half-life in blood, it is detectable in urine for eight to 10 hours, as the article cited by the dissent explains. (Jones, et al., *Driving under the Influence of Opiates*: *Concentration Relationships Between Morphine*, *Codeine*, *6-Acetyl Morphine*, *and Ethyl Morphine in Blood*, 32 J. Analytical Toxicology 265, 265-266 (2008), https://academic.oup.com/jat/article-pdf/32/4/265/2249657/32-4-265.pdf.) The same article further explains that even without detection of 6-AM, the ratio of morphine to codeine can still provide "compelling evidence" of heroin use (*id.* at p. 271), as the prosecution's toxicologist testified at trial. If it mattered that Noujaim was under the influence of heroin rather than some other intoxicant, the police had plenty of time to obtain a urine sample, and perhaps the prosecution should have called their toxicologist to testify at the suppression hearing. But it did not matter, because Noujaim was charged with "driving" "under the influence of any drug" (Veh. Code, § 23153, subd. (f)), not a heroin-specific crime.

17

injury must be reversed because they are necessarily lesser included offenses of count 1, vehicular manslaughter while intoxicated.[6]

Finally, Noujaim urges us to direct the trial court to set aside his plea of guilty to the misdemeanor DUI violation in count 3. Citing *People v. Fry* (1969) 271 Cal.App.2d 350, 358, Noujaim argues that "[w]here a defendant appeals from a judgment of a plea of guilty following a denial of a motion to suppress evidence material to the charge against him, and the appellate court determines denial of his motion was error, the judgment will be reversed with instructions to set aside the plea upon which it was entered." Defendant makes no effort to explain how his motion to suppress the evidence from the September 10, 2019, warrantless blood draw might possibly be material to the April 7, 2020, misdemeanor DUI charge. The record shows the charge to which Noujaim pleaded guilty was based on a blood test he consented to on April 7, 2020, and he did not challenge admission of that evidence either in the trial court or on appeal. Accordingly, we find no basis to allow defendant to withdraw his guilty plea to count 3.

---

[6] "Where, as here, an error is of constitutional dimension, we excuse it as harmless only if we are persuaded beyond a reasonable doubt that it did not contribute to the guilty verdicts." (*Meza*, *supra*, 23 Cal.App.5th at p. 612.) The People do not attempt to argue that the erroneous admission of the blood test evidence was harmless. On this record, we cannot conclude that the erroneous admission of the blood test evidence was harmless beyond a reasonable doubt. The prosecution's own toxicologist testified at trial that she could not opine on whether Noujaim was impaired at the time of the accident.

## DISPOSITION

The sentence is vacated, and the convictions on counts 1 and 2 are reversed. On remand, the trial court is directed to vacate the order denying defendant's motion to suppress evidence obtained through the warrantless blood draw on September 10, 2019, and to enter an order granting the motion. After the People decide whether to retry counts 1 and 2, and following the conclusion of any such retrial, the trial court shall resentence Noujaim.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
                                                                    J.

I concur:


RAPHAEL
                    J.

19

[*The People v. Ruben Noujaim*, E076514]

Ramirez, P. J., Dissenting

I respectfully disagree because the majority's conclusion is not supported by the record.  This court holds that there were no exigent circumstances which would excuse a warrantless blood draw from the defendant because (1) "testimony failed to establish that there was no 'opportunity for a different officer to transport the defendant to the station . . . prior to Seguin's arrival' at 9:13 p.m."; (2) the People failed to explain why Deputy Chavez could not have called the station to request that another deputy begin the warrant application process before Deputy Seguin arrived; and (3) "that even after Seguin arrived at the station with Noujaim around 9:30 p.m., the additional hour he estimated it would have taken to obtain a warrant would still have allowed blood to be drawn within the three-hour guideline for reliable alcohol testing."  (Maj. opn., pp. 15-16.)

However, these conclusions are refuted by other evidence in the record, evidence that supports the trial court's ruling.  Where the trial court's factual findings are supported by substantial evidence, they must be upheld, leaving to us the responsibility for determining whether the trial court's legal conclusion that the search was or was not unreasonable.  (*People v. Loewen* (1983) 35 Cal.3d 117, 123, citing *People v. Lawler* (1973) 9 Cal.3d 156, 160.)  The majority has deviated from this standard.

1) *"Opportunity for a different officer to transport the defendant to the station . . . prior to Seguin's arrival."*

The majority's deviation begins with a misapplication of the holding of *People v. Meza* (2018) 23 Cal.App.5th 604 (*Meza*), in concluding there were no exigent circumstances. (Maj. opn., p. 15.) It notes that in *Meza,* "shortly after arriving at an accident scene, the investigating officer observed objective signs of intoxication and determined that the defendant should be arrested for driving under the influence. (*Meza,* at pp. 606-607.) Rather than trying to get a search warrant, the officer ordered a warrantless blood draw after having spent time on tasks that could have been assigned to other officers or postponed until after a warrant application had been submitted." (Maj. opn., p. 15, citing *Meza, supra,* 23 Cal.App.5th pp. 606-607, 611-612.)

In this respect, the majority misapplies the holding of *Meza*, where the officer who conducted the investigation into Meza's intoxication accompanied Meza to the hospital for treatment, advised Meza of the implied consent law, and, when Meza did not object, directed the warrantless blood draw. In doing so, the officer did not rely on exigent circumstances, but, instead, operated under the erroneous conclusion the defendant there had acquiesced in the warrantless search. (*Meza, supra*, 23 Cal.App.5th at pp. 606-607.) In affirming the denial of Meza's suppression motion, the court applied a harmless error analysis, because defendant's blood had been drawn in the course of treatment at the hospital, so that the blood alcohol results would have been inevitably discovered. The present case mirrors none of the factors at play in *Meza* respecting the warrantless blood draw.

2

The majority thus concludes the reason for the delay in this case lay solely on the shoulders of law enforcement, disregarding the fact that defendant's own comportment at the scene (maj. opn., p. 3) required Deputy Chavez to postpone the interview, which was what gave rise to probable cause to believe defendant was driving under the influence of opiates, as well as the exigencies of investigating a fatal collision. As for Deputy Seguin, he was aware defendant was suspected of driving under the influence of pain killers and knew that the passage of time affected the reliability of the testing results. The record demonstrates there was no opportunity for another officer to transport defendant to the station until Seguin arrived.[1]

---

[1] The majority takes issue with this statement, referring to the trial court's statement, "Now, was there an opportunity for a different officer to transport the defendant to the station prior to 9:20, 9:30? I don't know whether there was or not—I mean, prior to Seguin's arrival, I don't know." as evidence that there was such an opportunity. (Maj. opn., p. 16, fn. 3.) The majority reads too much into this rhetorical question, which, in proper context, supports its conclusion that there were exigent circumstances: "Now, based on what I heard, there was a lot going on. Obviously, Deputy Chavez was busy, at least during the second part of the investigation, with the defendant, field sobriety tests, the interviews, an all of that. [¶] Now was there an opportunity for a different officer to transport the defendant to the station prior to 9:20, 9:30? I don't know whether there was or not—I mean, prior to Seguin's arrival, I don't know." Rather than expressing uncertainty about whether Chavez had time to telephonically relay warrant information to the station, the reasonable interpretation of the statement is that Chavez did *not* have the time or opportunity and the court could not determine whether, before Seguin's arrival, anyone else did, either.

Thus, the conclusion that Chavez did have such an opportunity is a factual finding that contradicts the record of the trial court's conclusion that the exigent circumstances were not created by law enforcement and that exigent circumstances did exist. Further, the trial court's summary of the evidence adduced at the hearing indicates it determined that when Seguin was called in, the defendant had not yet refused to submit to a blood test and that Seguin's presence had been intended to assist with the accident investigation, given that he was an accident investigator. The court concluded that at the time he was called in, it was not then known that a search warrant was needed. By the

*[footnote continued on next page]*

2) *"Why Deputy Chavez could not have called the station to request that another deputy begin the warrant application process before Deputy Seguin arrived."*

The majority acknowledges that the investigation of the scene required "all available deputies to be on the scene participating until all necessary tasks had been assigned" (maj. opn., p. 3), to the point of summoning Deputy Seguin on his day off. (Maj. opn., p. 6.) Yet it speculates that Deputy Chavez could have called the station to request another deputy begin the warrant application process before Deputy Seguin's arrival. Given the unrefuted evidence that the warrant application process required approximately a half hour, and, given the unrefuted evidence that Deputy Chavez was responsible for overseeing a complex traffic investigation involving a fatality, the majority's finding is again based on speculation.

In this respect, the majority's focus on Deputy Chavez's conduct ignores the distinction between this case and the decision in *Meza,* where the delay in that case was occasioned not by the lead investigating officer, but, instead, by the officer tasked with pursuing the intoxication investigation, Officer Cruz, who did not apply for a warrant and did not act promptly in pursuing a warrant; instead, after she informed the defendant he was required to submit to a blood test and, when the defendant did not refuse, she

_____

time Seguin arrived, however, it was known that a search warrant was needed, but Chavez was busy. Thus, when Seguin arrived, he was assigned to transport defendant to the station and apply for a warrant. The majority's findings are therefore in conflict with those of the trial court.

4

determined there was consent and that a warrant was unnecessary. (*Meza, supra*, 23 Cal.App.5th at pp. 606-607.)

Here, on the other hand, the evidence adduced at the hearing demonstrated that the investigation of the incident required involvement of 10 to 15 law enforcement officers actively investigating the fatal incident, and that until Deputy Seguin arrived (nearly two hours after the accident), there was no one available to transport defendant to the station. The majority fails to point to anything in the record supporting an inference that Chavez's presence at the investigation scene was not required. Nor does the majority cite any evidence in the record to support a factual inference—not drawn by the trial court—that Chavez could have called the station to provide the information to someone who could apply for the warrant.

Thus, the first factual conclusion (and the corresponding analogy to *Meza*) drawn by the majority lacks support in the record: The statement that the prosecution failed to explain why Chavez did not call the station to relay the information needed for a warrant (maj. opn., pp. 15-16) ignores the fact he was the lead investigator responsible for coordinating an active investigation of a fatality involving many deputies. Further, as the majority acknowledges, the Riverside County Sheriff had not yet implemented its new tablet computer system allowing deputies to apply for search warrants from the field. (Maj. opn., p. 5.) Instead, the majority speculates he had a half hour to spare at the accident scene to call the station to relay the information necessary for a warrant

5

application and failed to act.[2]  Absent evidence in the record, this approaches fact-finding on appeal, which is impermissible on direct appeal.

To conclude, without evidence, that Chavez had time to stop directing the moving parts of the investigation to call in a warrant application is to engage in speculation and to reweigh the evidence, which is not our province.  "In such a proceeding the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court.  On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence."  (*People v. Lawler* (1973) 9 Cal.3d 156, 160; see also *People v. Zamudio* (2008) 43 Cal.4th 327, 346, fn. 7; *People v. Johnson* (2006) 38 Cal.4th 717, 728; *People v. Woods* (1999) 21 Cal.4th 668, 673.)  Therefore, the record refutes the conclusion "the testimony failed to establish that there was no 'opportunity for a different officer to transport defendant to the station . . . prior to Seguin's arrival.'"  To the contrary, the record establishes that Chavez did not have available another officer to transport defendant to the station prior to Seguin's arrival, and defendant did not elicit testimony that would refute his testimony.  Absent pure speculation, we are not free to reach a different factual finding.

---

[2] The majority disagrees and reasserts that Chavez had a half hour to spare to call the station to relay the information necessary for the preparation of a search warrant, noting that it only took approximately 12 minutes to brief Seguin upon his arrival.  (Maj. opn., p. 16, fn. 4.)  However, this is a factual determination inappropriate to our review on appeal, and contrary to the trial court's factual finding that Chavez was busy and that the exigent circumstances were not attributable to law enforcement.

3) *"Even after Seguin arrived at the station with Noujaim around 9:30 p.m., the additional hour he estimated it would have taken to obtain a warrant would still have allowed blood to be drawn within the three-hour guideline for reliable alcohol testing."*

Turning to Seguin's decision to have the blood drawn before obtaining the warrant, there are also extenuating circumstances related to the fact the substance under which defendant was suspected of driving was not alcohol, and, by the time Deputy Seguin arrived and received instructions from Chavez (9:13 p.m.), an hour and a half had already elapsed since the incident. At the station, to ensure the reliability of test results, Sequin directed the phlebotomist to draw the blood, which took two minutes, and then applied for the warrant, which took nearly an hour, as correctly predicted. The officer's stated reason for proceeding with the draw was to ensure the reliability of the test results, which was a valid concern. However, at the outset, it must be recalled that alcohol consumption was not suspected, so the three-hour guideline for reliable alcohol testing is of limited utility.

The testimony of the forensic analyst showed that opiates in the blood metabolize and dissipate at a faster rate than alcohol and that heroin breaks down very quickly and in a different manner than alcohol. In fact, one metabolite, 6-acetyl morphine (6-AM), the precursor of 6-mono-acetyl morphine (6-MAM), which was found in defendant's blood, is not usually even present after 25 minutes. Yet, this metabolite is the litmus test for distinguishing street heroin from prescription opiates. (Jones, et al., *Driving under the Influence of Opiates: Concentration Relationships Between Morphine, Codeine, 6-Acetyl*

7

*Morphine, and Ethyl Morphine in Blood,* 32 J. Analytical Toxicology 265 (2008), https://academic.oup.com/jat/article-pdf/32/4/265/2249657/32-4-265.pdf.) Heroin is therefore unlike alcohol, which dissipates at a relatively constant rate over time.[3]

*Analysis*:

It is incorrect to conclude that like the situation in *Meza*, the delay was attributable to law enforcement. The initial delay in interviewing defendant was due to the defendant's distraught condition. When the interview took place, defendant admitted the use of opiates[4] and made inconsistent statements about his ingestion of pain killers that raised doubt about whether he had taken prescription drugs or other substances. Defendant failed the field sobriety tests (FSTs) and was placed under arrest. Chavez, as lead investigator, was compelled to find another deputy to transport defendant to the station and apply for a warrant. When Seguin arrived, more than an hour after the initially responding officers arrived at the scene, Chavez requested that he transport defendant to the station for the purpose of obtaining a warrant to draw defendant's blood.

---

[3] Street heroin contains acetyl codeine as an impurity. (Jones, et al., *Driving Under the Influence of Opiates, supra*, 32 J. Analytical Toxicology, at p. 267.) Acetyl codeine metabolizes into codeine which complicates the interpretation because it is found in both prescription pain killers as well as in heroin. (*Id.* at pp. 269, 270.) For this reason, proof of heroin intake is easier where the blood is tested sooner rather than later, because 6-AM will not be detected after a very short window of time. (*Id.* at p. 271.) In such cases, it cannot be conclusively determined to be street heroin as opposed to prescription medication.

[4] Defendant admitted ingesting Tylenol-3, which contains 300 mg. of codeine, and is listed in Schedule II of the Uniform Controlled Substances Act as an opiate. (Health & Saf. Code, § 11055, subd. (b)(1)(G).) Heroin is listed in Schedule I. (Health & Saf. Code, § 11054, subd. (c)(11).)

Further, the finding there was an exigency in the circumstances present here is well within the reasoning of the holdings of *Missouri v. McNeely* (2013) 569 U.S. 141 [185 L. Ed. 2d 696, 133 S. Ct. 1552] and *Mitchell v. Wisconsin* (2019) 139 S. Ct. 2525 [204 L. Ed. 2d 1040, 139 S. Ct. 2525, 2537] (plur. opn. of Alito, J.), which do not categorically prohibit a determination that exigent circumstances for a warrantless search of a person's blood in all cases. *McNeely* rejected a *per se* rule that when police officers have probable cause to believe a person has been driving under the influence of alcohol, exigent circumstances necessarily exist because of the evanescence of alcohol. (*McNeely, supra,* 569 U.S. at pp. 151-152.) Instead, it concluded, "We do not doubt that some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted[5] warrantless blood test. That, however, is a reason to decide each case on its facts, as we did in *Schmerber*, not to accept the 'considerable overgeneralization' that a *per se* rule would reflect. [Citation.]" (*McNeely, supra*, at p. 153.)

I agree with the holdings of *McNeely,* and *Mitchell* and their progeny, that the evanescence of alcohol in the bloodstream over time, by itself, does not give rise to exigent circumstances justifying a warrantless blood draw as a *per se* rule. I also agree that each case must be evaluated on its own merits and based on the record evidence before us. I also agree we must defer to the trial court's factual findings unless not supported by the record. However, the majority has overlooked the elephant in the room:

_____

**5** Ref. *Schmerber v. California* (1966) 384 U.S. 757, 770-771 [16 L. Ed. 2d 908, 86 S. Ct. 1826].

this case does not involve a warrantless search for *alcohol* in defendant's blood.[6]  The

trial court in this case was not presented with a situation in which an intoxicant ingested

by a defendant dissipated at a constant rate over time.  The metabolism of heroin and

other opiates is different from that of alcohol, so the *per se* application of legal principles

applicable to dissipating blood alcohol levels are inapposite.

  *McNeely*, *Mitchell* and other decisions addressing the reasonableness of a

warrantless search of a suspect's blood for alcohol are uniform in cautioning against any

categorical finding of exigent circumstances based solely on the evanescence of alcohol,

as well as in reminding us that exigent circumstances may justify the search, after a case

by case evaluation.  For this reason, the fundamental differences between alcohol and

---

  **6**  The majority argues that the difference between opiates and alcohol in the blood is irrelevant because the People did not call the forensic toxicologist.  (Maj. opn., p. 16, fn. 5.)  Yet, when defense counsel asked Seguin, "Are you aware of Title 17?", the People objected, and the witness indicated he was familiar with some aspects.  Defense counsel then asked the witness if he was aware that "generally within three hours of an incident is a safe time to take blood and it is still compliant with Title 17."  The People objected again, stating, "Misstates the law.  Title 17 refers to alcohol."  This indicates the People were well aware of the differences between the dissipation of opiates as compared to alcohol, rendering the dissipation rate of alcohol irrelevant to the calculus of exigent circumstances.
  The majority also mistakenly states that there is no difference between the metabolite 6-AM, which dissipates in minutes, and 6-MAM, which dissipates within a few hours.  (Maj. opn., pp. 16-17, fn. 5.)  This statement is refuted by the reference provided above.  Further, the question was not whether defendant was under the influence of heroin versus a prescription drug and my reference to the differences between the two intoxicants has been misconstrued.  The issue is whether the constant dissipation rate of alcohol, which the nation's high court has said does not, by itself, justify a warrantless seizure of blood, can be applied to a situation in which the defendant is not suspected of driving under the influence of alcohol, but, instead, under the influence of an opiate which undergoes a different type of metabolism and a different rate of dissipation.

10

heroin must be taken into consideration. Because the metabolism of heroin differs from that of blood alcohol, a fact adduced by the toxicological analyst, decisions and regulations pertaining to the lack of exigency for blood alcohol testing within three hours are not a proxy for determining if exigent circumstances exist in a case involving driving under the influence of drugs such as heroin or other opiates using the same time frames.

Here, the experienced trial court was presented with the testimony of the deputies, as well as that of the forensic analyst. Noujaim admitted using pain killers, manifested other objective symptoms of recent opiate use, gave inconsistent statements about the drugs he had ingested, had pinpoint pupils and failed to successfully complete field sobriety tests. The trial court also considered evidence that Chavez was the lead investigator who could not leave the scene, that an off-duty officer had to be called in to assist and to transport defendant to the station. By the time that officer could transport the defendant to the station, nearly two hours had passed, and the process of obtaining a warrant was estimated to—and did—consume another approximately one hour of time, during which time opiates in defendant's blood were being metabolized into different substances. There was no evidence the delay in transporting the defendant to the station was due to the officers' failure to act with alacrity, but, rather, due to the exigencies of the investigation and the availability of manpower.

Taking into consideration that lack of evidence that opiates metabolize and dissipate at the same rate as alcohol, the experienced trial court's conclusion there were exigent circumstances justifying the warrantless draw should be affirmed. The

11

benchmark of an unreasonable search is that it must be unreasonable. Unlike the

warrantless blood draw in *Meza,* the actions of the officers in this case were reasonable,

despite Seguin's decision to put the cart before the horse. The court's finding of exigent

circumstances is entitled to greater deference than it has been accorded in this case.

*Harmless Error:*

Even if I were to agree the warrantless search was unreasonable, there is the

question of harmless error.[7] "Where, as here, an error is of constitutional dimension, we

excuse it as harmless only if we are persuaded beyond a reasonable doubt that it did not

contribute to the guilty verdicts." (*Meza, supra*, 23 Cal.App.5th at p. 612 citing

*Chapman v. California, supra,* 386 U.S. 18, 24; *People v. Neal* (2003) 31 Cal.4th 63, 86.)

Even if the evidence of the confirmatory blood test results were suppressed, the objective

---

[7] The majority argues it is inappropriate to consider whether any error was harmless or not because the People did not argue that the warrantless search was harmless in the trial court. (Maj. opn., p. 18, fn. 6.) Nevertheless, on appeal, when we find error, we are required to consider whether the error was harmless or not. "Under article VI, section 13 of the California Constitution, we do not have discretion to reverse a judgment without first conducting harmless error review." (*People v. Sandoval* (2015) 62 Cal.4th 394, 446 [notwithstanding the People's failure to argue that constitutional error was harmless, court was required to conduct a prejudice review under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L. Ed. 2d 705, 87 S. Ct. 824].)

As I have indicated above, we review trial court error in admitting evidence in violation of the Fourth Amendment under the harmless error standard of *Chapman v. California, supra,* 386 U.S. 18. Under that standard, the Fourth Amendment violation is reversible unless the reviewing court (that is, this court) is convinced the error was harmless beyond a reasonable doubt. (*People v. Matthews* (2018) 21 Cal.App.5th 130, 141; *People v. Howard* (1987) 190 Cal.App.3d 41, 45-46; *People v. Avila* (1995) 35 Cal.App.4th 642, 654.) That the People did not posit this argument does not relieve us of our duty to address prejudice. The constitutional nature of the issue affects the degree of prejudice or harmlessness required for reversal but does not dispense with the consideration of prejudice.

signs of impairment and defendant's own admissions of opiate consumption, admissible in trial, provide substantial evidence to support the conviction. Thus, any error should be deemed harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. 18.) In this respect, I do find the reasoning of *Meza* to be persuasive. (*Meza, supra*, 23 Cal.App.5th at pp. 612-613.)

In the present case, the officers had independently obtained defendant's admission he had taken opiates. Defendant also manifested other objective symptoms of being under the influence of opiates—glossy eyes and pinpoint pupils, and he failed the FSTs. The jury heard this evidence which was sufficient to prove defendant was driving under the influence of drugs. Thus, any error was harmless beyond a reasonable doubt where the jury had ample evidence on which to convict defendant of driving under the influence of drugs. (*People v. Siripongs* (1988) 45 Cal.3d 548, 567.)

The trial court found exigent circumstances despite Seguin's decision to have the blood drawn before the warrant had been obtained. Had the blood been drawn an hour later, the analyst might not have been able to reliably identify the drug ingested by Noujaim. I would affirm the trial court's decision. But even if I were to agree that the warrantless search was unreasonable, I would not vacate the judgment; instead I would remand the matter to the trial court to give the People the option of proceeding without the forensic evidence obtained without a warrant.

RAMIREZ

P. J.

13