Filed 12/29/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANCISCO ANDRES ALVAREZ,<br><br>    Defendant and Appellant. | D080585<br><br><br>(Super. Ct. No. SCN385509) |


APPEAL from an order of the Superior Court of San Diego County, Harry M. Elias, Judge. Reversed and remanded with directions.

Deanna L. Lopas, under appointment of the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Andrew Mestman, and Elizabeth M. Renner, Deputy Attorneys General, for Plaintiff and Respondent.

In *Mitchell v. Wisconsin* (2019) 588 U.S. ___ [139 S.Ct. 2525] (*Mitchell*), a plurality of the United States Supreme Court held when a "driver is unconscious and therefore cannot be given a breath test . . . the exigent-circumstances rule almost always permits a blood test without a warrant."

(*Id*. at p. 2531 (plur. opn. of Alito, J.).)  In this appeal we consider the constitutionality of a warrantless blood draw from a person involved in a car accident where unconsciousness or unresponsiveness occurred in a hospital about 90 minutes after the incident.  We conclude no exigent circumstance as defined in *Mitchell* or *Schmerber v. California* (1966) 384 U.S. 757 (*Schmerber*) allowed a warrantless blood draw.  We reject the People's argument that the officer's good faith reliance on Vehicle Code[1] section 23612, subdivision (a)(5),[2] allowed prosecutors to use the fruits of the otherwise illegal search.  Accordingly, the trial court erred when it denied the motion to suppress filed by Francisco Andres Alvarez.  We therefore reverse the judgment and remand the matter with instructions to grant Alvarez's motion to suppress and conduct further proceedings regarding Alvarez's guilty plea.

FACTUAL AND PROCEDURAL BACKGROUND

At around 11:30 p.m. on March 25, 2018, officers arrived at the scene of a fatal car accident.  One vehicle, a silver Dodge Charger, lay upside down in the roadway just north of the intersection at Ash Street and El Norte Parkway in Escondido.  Another car, a Ford Mustang, rested in a house's

---

[1]    Undesignated statutory references are to the Vehicle Code.

[2]    Section 23612, subdivision (a)(5) states:  "A person who is unconscious or otherwise in a condition rendering him or her incapable of refusal is deemed not to have withdrawn his or her consent and a test or tests may be administered whether or not the person is told that his or her failure to submit to, or the noncompletion of, the test or tests will result in the suspension or revocation of his or her privilege to operate a motor vehicle."

front yard immediately next to the intersection.[3]  Officer Guy Yost spoke briefly to Alvarez who admitted to driving the silver Charger.  Alvarez seemed uninjured but shaken by the collision.  The officer did not detect any overt signs or symptoms that Alvarez drove while under the influence of alcohol or drugs.  Nonetheless, Officer Yost administered to Alvarez the horizontal gaze nystagmus (HGN) field sobriety test.[4]  The officer noted "just a faint jerking in [Alvarez's] eyes at the extremes."  Emergency medical personnel arrived.  They transported Alvarez and the sole surviving Mustang occupant, then 15-year-old Jose M., to Scripps La Jolla Hospital emergency room.

An on-scene witness told Officer Yost that prior to the accident a silver car (later identified as Alvarez's), came up behind the witness, either tailgating or flashing its high beams, as they both drove north on Ash Street.  When the roadway opened to become two lanes, Alvarez passed the witness

---

[3]     Medical personnel on scene that evening declared dead the Mustang's driver and one of its two passengers.

[4]     " 'Nystagmus is an involuntary rapid movement of the eyeball, which may be horizontal, vertical, or rotary.  [Citation.]  An inability of the eyes to maintain visual fixation as they are turned from side to side (in other words, jerking or bouncing) is known as . . . HGN.  [Citation.]  Some investigators believe alcohol intoxication increases the frequency and amplitude of HGN and causes HGN to occur at a smaller angle of deviation from the forward direction.' " (*People v. Leahy* (1994) 8 Cal.4th 587, 592.)

quickly on the right.[5]  Officer Yost drew no conclusion regarding fault for this incident, and did not form an opinion whether the traffic light for Alvarez was red, yellow, or green until after completing the investigation.[6]

After completing his work at the crash site at 12:14 a.m., Officer Yost went to the hospital to speak with Alvarez and Jose M.  Officer Yost arrived about 12:45 a.m., or roughly 75 minutes after the accident.  In the emergency room doctors and nurses periodically attended to Alvarez.  Officer Yost smelled an odor of alcohol emanating from him.  Alvarez admitted to drinking a beer earlier that day.  About 1:00 a.m., Officer Yost performed another field sobriety test using a preliminary alcohol screening (PAS) device.[7]

---

[5]  Both parties state the witness told Officer Yost the witness saw the silver car go through the intersection against a yellow or red light.  This is based on Officer Yost's suppression motion testimony taken 18 months after events.  But at the preliminary examination six months after the collision, the same witness testified he did not see the accident.  The witness went on to say he only saw the light change from yellow to red about 30 seconds *after* he heard a collision.  That is when he got close enough to see the intersection.  Neither the judge hearing the suppression motion nor either party addressed this discrepancy.  Because this appeal attacks the sufficiency of evidence presented at the suppression motion, appellant relies only on testimony from that hearing.  We review the entire appellate record, however.  Given the obvious factual contradiction described above, we are unable to conclude the statement in the briefs is accurate, even under the implied findings doctrine, because we have no indication the court perceived and resolved it.

[6]  The investigation revealed appellant entered the intersection after the traffic light turned red.  Since Officer Yost did not have that information while at the hospital, we do not consider it.

[7]  Officer Yost described the PAS as "a portable mini breathalyzer."  It does not yield evidence-grade alcohol concentration results.  (See *Birchfield v. North Dakota* (2016) 579 U.S. 438, 487 (conc. & dis. opn. of Sotomayor, J.) (*Birchfield*).)

4

Alvarez could not, or would not, provide a breath sample sufficient for the PAS device to operate automatically and give a blood alcohol readout. Officer Yost used a PAS technique called a manual trap. This means the PAS operator presses a button on the device making it capture and test a subject's breath sample even when that sample is insufficient to trigger the device's automated features. Based on Officer Yost's experience, manual traps typically yield a lower blood alcohol result than the normal, automatic method. Alvarez's PAS results reflected a 0.037 and 0.039 blood alcohol concentration (BAC).

About five minutes after the PAS test, given the elapsed time since the accident, the officer informed Alvarez that the officer wanted to get a blood sample. At this point, Alvarez stopped responding verbally or nonverbally to the officer. Alvarez lay in the hospital bed with his eyes closed, not opening them while the officer spoke to him. Nor did Alvarez communicate further to hospital personnel. Officer Yost could not tell whether Alvarez was asleep, unconscious, or just ignoring him. Concerned that Alvarez could be moved to another part of the hospital for treatment, Officer Yost radioed for a forensic blood draw. His dispatch center informed him that the phlebotomist's estimated arrival time would be 30 minutes later. Almost two and one-half hours after the accident, at 1:57 a.m., the phlebotomist took Alvarez's blood. Alvarez did not react when the phlebotomist stuck the needle into his arm.

The blood test revealed a 0.05 percent blood alcohol level with the presence of cocaine and THC.[8]

The People charged Alvarez with, among other crimes, two alcohol related vehicular manslaughter counts under Penal Code section 191.5, subdivision (a).[9] On August 29, 2018, Alvarez moved to suppress the blood testing results pursuant to Penal Code section 1538.5, subdivision (a)(1).[10] On November 30, 2018, the parties appeared for the suppression motion hearing. The People could find no exception allowing Officer Yost to obtain a blood sample without first securing a warrant. Consequently, the People conceded the motion.

As a result, on January 15, 2019, prosecutors filed an amended information charging Alvarez with two non-alcohol related vehicular

---

[8] THC (tetrahydrocannabinol) is the psychoactive chemical in marijuana "that causes the 'high' associated with its use." (*People v. Kidane* (2021) 60 Cal.App.5th 817, 823.) While this information provides context for the case's procedural posture in the trial court, we do not consider these test results in our analysis since Officer Yost did not have them while evaluating the appellant in the hospital.

[9] Subdivision (a) of Penal Code section 191.5 states: "Gross vehicular manslaughter while intoxicated is the unlawful killing of a human being without malice aforethought, in the driving of a vehicle, where the driving was in violation of Section 23140, 23152, or 23153 of the Vehicle Code, and the killing was . . . the proximate result of the commission of an unlawful act, not amounting to a felony, and with gross negligence."

[10] Penal Code section 1538.5, subdivision (a)(1) states: "A defendant may move for the return of property or to suppress as evidence any tangible or intangible thing obtained as a result of a search or seizure [where]: ¶ (A) The search or seizure without a warrant was unreasonable."

6

manslaughter violations under Penal Code section 192, subdivision (c)(1)[11] and a reckless driving charge. On January 15, 2019, Alvarez pled not guilty to the new allegations. After a series of continuances, the court scheduled the jury trial for October 1, 2019.

However, in the interim, on June 27, 2019, the United States Supreme Court delivered its opinion in *Mitchell*, *supra*, 588 U.S. ___ [139 S.Ct. 2525]. In a plurality decision, the court found "when police have probable cause to believe a person has committed a drunk-driving offense and the driver's unconsciousness or stupor requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may almost always order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment."

---

[11] Subdivision (c)(1) of Penal Code section 192 states: "Manslaughter is the unlawful killing of a human being without malice. [¶] . . . [¶] [by] (1) . . . driving a vehicle in the commission of an unlawful act, not amounting to a felony, and with gross negligence."

(*Id.* at p. 2539 (plur. opn. of Alito, J.).)[12]  Citing *Mitchell*, the People moved the trial court for reconsideration of Alvarez's motion to suppress.  The trial court granted the request.

The rescheduled suppression hearing commenced on September 20, 2019.  Officer Yost testified he believed the PAS test result would support probable cause to obtain a warrant.  He also said getting the warrant would have created substantial delays primarily because he was the only officer at the hospital, he did not have the proper paperwork, and other officers were still investigating the scene.  At the end of the hearing's first day the trial judge posed these questions for the attorneys to address when they reconvened:  Did facts support finding probable cause existed to get a blood sample from Alvarez?  Even if probable cause existed, did exigent circumstances allow taking a blood sample from Alvarez without a warrant?  The court requested additional briefing from the parties, recessed the matter, and reconvened on December 5, 2019.

---

[12]  "[W]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .' " (*Marks v. United States* (1977) 430 U.S. 188, 193, quoting *Gregg v. Georgia* (1976) 428 U.S. 153, 169, fn. 15.)  In *Mitchell*, four justices agreed with the quoted holding.  A fifth justice, Justice Thomas, concurred with those four colleagues "only in the judgment." (*Mitchell*, *supra*, 588 U.S. at p. ___ [139 S.Ct. at p. 2539] (conc. opn. of Thomas, J.)  Justice Thomas instead urged adopting the more expansive approach from his dissent in *Missouri v. McNeely* (2013) 569 U.S. 141 (*McNeely*) (dis. opn. of Thomas, J.), that a per se exigency always exists in drunk driving arrests. (*Id.* at p. 176 ["Because the body's natural metabolization of alcohol inevitably destroys evidence of the crime, it constitutes an exigent circumstance.  As a result, I would hold that a warrantless blood draw does not violate the Fourth Amendment"].)  Under *Marks* the narrower rule announced by Justice Alito is the court's holding in *Mitchell*.

8

At the hearing's continuation on December 5, 2019, the People recalled Officer Yost. Officer Yost expanded on his earlier testimony. Specifically, among other statements, the officer said he felt exigent circumstances existed. Given the medical activity surrounding Alvarez, and that Alvarez appeared unresponsive, by the time warrant paperwork might arrive, the officer believed hospital personnel would take Alvarez away from the trauma room for further treatment and eliminate any possibility he could obtain a blood sample. Further, the officer explained he did not believe he needed a warrant because Alvarez appeared unresponsive or unconscious triggering section 23612, subdivision (a)(5).[13]

The trial court denied Alvarez's suppression motion finding *Mitchell*, *supra*, 588 U.S. __ [139 S.Ct. 2525] applied. The court stated, "exigent circumstances permit[ed] a blood test without a warrant." Alvarez later pled guilty but did not waive his appeal rights.

## DISCUSSION

### A. *Standard of Review*

"On appeal from a motion to suppress evidence, all presumptions are in favor of the trial court's factual findings, whether express or implied, where supported by substantial evidence . . . ." (*People v. Ledesma* (2003) 106 Cal.App.4th 857, 862.) " 'Substantial evidence' means that evidence which, when viewed in light of the entire record, is of solid probative value, maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined." (*People v. Conner* (1983) 34 Cal.3d 141, 149.) "But while we defer to the superior court's express and implied factual findings if they are supported by substantial evidence, we exercise our

---

[13] See *ante*, footnote 2.

9

independent judgment in determining the legality of a search [or seizure] on the facts so found." (*People v. Woods* (1999) 21 Cal.4th 668, 673–674.)

B. *Exigent Circumstances Did Not Exist to Allow a Warrantless Blood Draw*

Alvarez argues that even if Officer Yost had probable cause to think Alvarez drove under the influence that evening, no exigency existed to overcome the requirement that officers get a warrant to obtain a blood sample. Citing to *People v. Meza* (2018) 23 Cal.App.5th 604 (*Meza*), Alvarez argues almost two and one-half hours elapsed between when the accident occurred and the phlebotomist's arrival at the hospital, giving Officer Yost ample time to obtain a warrant. Indeed, the officer knew the San Diego County electronic search warrant program existed and that it worked quickly. Officer Yost admitted an electronic warrant would take only 30-45 minutes to obtain. However, he never even tried to get a warrant.

The People argue *Meza*'s reasoning should be disregarded since that case predates *Mitchell*. (See *People v. Nault* (2021) 72 Cal.App.5th 1144, 1149.) Relying on *Mitchell*, the People contend they showed emergency circumstances justified a warrantless blood test. In the hospital roughly two hours following the crash, Alvarez appeared unresponsive supporting probable cause to believe that he drove while under the influence. Further, medical activity directed at Alvarez in the emergency room created exigent circumstances because, given Alvarez's unresponsiveness following a roll-over accident, the officer feared Alvarez may be taken for medical services elsewhere in the hospital and the blood evidence would be lost.

In *Meza*, *supra*, 23 Cal.App.5th 604, a driver lost control of his car and ran off a roadway. (*Id.* at p. 606.) An officer at the scene noted a moderate odor of alcohol from defendant, and that his eyes were watery and red. The officer concluded defendant should be arrested for driving under the

10

influence. (*Id.* at p. 607.) However, after defendant complained of neck and back pain, medical personnel transported him and his injured passenger to a hospital. (*Ibid.*) Trauma team workers tested defendant's blood as part of their routine workup prior to treatment. Also, the officer, without first obtaining a warrant, ordered blood taken for forensic purposes. The officer knew she could obtain an electronic warrant if she needed one. She chose not to because after telling defendant a phlebotomist was on the way to draw blood, defendant said "okay." (*Ibid.*)[14]

The *Meza* court found no exigent circumstances existed alleviating the officer's obligation to get a search warrant. The court observed from the time of the accident until the blood draw, two hours passed. Instead of using the time to get a warrant, the officer attended to other accident investigation related duties, even after the ambulance transported defendant to the hospital. The officer also did not appear to try enlisting the assistance of her colleagues. (*Meza*, *supra*, 23 Cal.App.5th at p. 611.) The court concluded, "[h]ad the officers tried to get a timely warrant but failed, then the People would have evidence to explain that failure, and our assessment of the totality of the circumstances would necessarily be different. [¶] If the court were to conclude on this record that exigent circumstances excuse law enforcement from getting a warrant, it would be hard to imagine a case requiring a warrant for a blood draw when a [driving under the influence] [(]DUI[)] suspect is taken to the hospital. We would be creating, *sub rosa*, a rule that exempts accident cases from the totality-of-the-circumstances inquiry that *McNeely* requires, and we would be ignoring *McNeely*'s point

---

14    The appellate court did not examine whether defendant's response constituted consent because respondent did not raise that issue on appeal. (*Meza*, *supra*, 23 Cal.App.5th at p. 611, fn. 2.)

11

about the availability of electronic warrants. [Citation.] This we decline to do." (*Id*. at p. 612.) The stronger argument belongs to Alvarez. We do not find exigent circumstances here.

The Fourth Amendment of the United States Constitution mandates that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." (U.S. Const., 4th Amend.) The Fourth Amendment's prohibition against unreasonable searches and seizures applies to states through the Fourteenth Amendment. (*Soldal v. Cook County* (1992) 506 U.S. 56, 61.) Drawing blood from a motorist to investigate a driving under the influence case is a search. (*Birchfield*, *supra*, 579 U.S. at p. 455 ["The [Fourth] Amendment thus prohibits 'unreasonable searches,' and our cases establish that the taking of a blood sample or the administration of a breath test is a search"].)

"The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' " (*United States v. Knights* (2001) 534 U.S. 112, 118–119.) " '[I]t is a cardinal principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." ' [Citations.] 'The burden is on the People to establish an exception applies [to the warrant requirement].' " (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1041.) "One important exception is for exigent circumstances. It applies when 'the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is

12

objectively reasonable.' [Citation.] The exception enables law enforcement officers to handle 'emergenc[ies]'—situations presenting a 'compelling need for official action and no time to secure a warrant.' " (*Lange v. California* (2021) __U.S.__ [141 S.Ct. 2011, 2017].)

In *Schmerber*, *supra*, 384 U.S. 757, the United States Supreme Court concluded that exigent circumstances could justify a warrantless blood draw during a DUI investigation because BAC diminishes over time and officers may need time to investigate an accident scene or attend to other pressing needs. (*Id.* at pp. 770–771.) But, "while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, as it did in *Schmerber*, it does not do so categorically. Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." (*McNeely*, *supra*, 569 U.S. at p. 156.)

More recently, our high court again examined "the important question . . . [of] what officers may do when a driver's unconsciousness (or stupor) eliminates any reasonable opportunity for [an evidentiary grade] breath test." (*Mitchell*, *supra*, 588 U.S. at p. ___ [139 S.Ct. at p. 2534] (plur. opn. of Alito, J.).) In its plurality opinion, the *Mitchell* court held that when a "driver is unconscious and therefore cannot be given a breath test . . . the exigent-circumstances rule almost always permits a blood test without a warrant." (*Id.* at p. 2531.) The court explained a drunk-driving suspect's unconsciousness creates exigency when "(1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application. Both conditions are met when a drunk-driving suspect is unconscious. . . ." (*Id.* at p. 2537.)

13

However, the *Mitchell* court did not reverse *McNeely*'s rule that officers need a blood-draw warrant if one is practical to obtain.  (See *McNeely*, *supra*, 569 U.S. at p. 155 ["[T]echnological developments that enable police officers to secure warrants more quickly, and do so without undermining the neutral magistrate judge's essential role as a check on police discretion, are relevant to an assessment of exigency.  That is particularly so in this context, where BAC evidence is lost gradually and relatively predictably"].)  To be sure, *Mitchell* agreed advances in technology made warrants quick and easy to obtain, noting the delay in getting them has "shrunk, but it has not disappeared.  In the emergency scenarios created by unconscious drivers, forcing police to put off other tasks for even a relatively short period of time may have terrible collateral costs.  That is just what it means for these situations to *be* emergencies." (*Mitchell*, *supra*, 588 U.S. at p. ___ [139 S.Ct. at p. 2539] (plur. opn. of Alito, J.).)

What then of a situation where the driver is not unconscious at the scene, where the medical personnel removed him from the crash site not because of overt injuries, but as a precaution, and the driver remained conscious and responsive until 90 minutes after the crash, which included interacting with the officer for almost 45 minutes in the emergency room?

"When police have probable cause to believe a person has committed a drunk-driving offense *and* the driver's unconsciousness or stupor *requires him to be taken to the hospital* or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may almost always order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment." (*Mitchell*, *supra*, 588 U.S. at p. ___ [139 S.Ct. at p. 2539] (plur. opn. of Alito, J.), italics added.)  In *Mitchell*, the motorist could barely walk when officers first approached

14

him and "continued to deteriorate" as police drove him to the station. (*Id.* at p. 2532.) By the time defendant reached the station, officers deemed him too lethargic even to attempt a breath test. (*Ibid.*) Defendant lost consciousness on the way to the hospital. (*Ibid.*) In *Schmerber*, the driver's injuries at the scene caused emergency responders to transport him directly from the accident site to the hospital for treatment. (*Schmerber*, *supra*, 384 U.S. at p. 758.)

Here, in contrast, Alvarez's unconsciousness (or unresponsiveness) did not motivate his transport to the hospital. Nor was he unconscious when the officer arrived at the hospital. Rather, Alvarez became unresponsive roughly 90 minutes after the accident, and almost 45 minutes after the officer began interacting with him at the hospital. Medical records suggested Alvarez had trouble staying awake and answered questions slowly. But nothing in the record before us shows that Alvarez's condition came near to the dire situations found in either *Schmerber* or *Mitchell* that gave rise to emergency medical interventions.

Nor on the record before us can we conclude a delay in getting a warrant would divert from the investigation. Officer Yost explained it takes between 30 and 45 minutes to get a telephonic warrant. More than 45 minutes passed between when Officer Yost encountered Alvarez in the hospital and when the phlebotomist arrived to draw blood. When asked why he did not seek a warrant that evening the officer stated, "I just didn't think of a warrant at that time. . . . And I don't think I was thinking I should get a warrant or I shouldn't get a warrant. That didn't cross my mind at that time, I guess."

Only in later testimony did Officer Yost note challenges in getting an electronic warrant. He mentioned the inconsistent radio access to his office

15

from the hospital,[15] the inability of other officers to assist him because he thought they remained in the field, and the fact that he did not have the paperwork for a warrant with him meaning he would need to leave the hospital to retrieve it. But the record does not reflect Officer Yost ever asked for, and was refused, assistance by other officers with getting a warrant. That would present us with a different record regarding exigency. As the trial court stated, "It would have been—calling for the warrant would not have been difficult. The time length of the warrant would not have been any greater . . . especially now with blood draws, once you call, it happens pretty quick."

Moreover, we could find nothing in the record suggesting medical professionals communicated to Officer Yost their intention to move Alvarez from the emergency room any time soon. Officer Yost's speculation it might happen did not create exigency. We agree with the *Meza* court's observation that concluding otherwise would mean anytime authorities transport a driver to a hospital an exigency exists. This we are unwilling to do. This record does not establish exigency as described in *Mitchell* and *Schmerber*.

C. *Officer Yost Did Not Reasonably and in Good Faith Rely on Section 23612, Subdivision (a)(5)*

Having found the blood draw violated Alvarez's Fourth Amendment right against unreasonable searches and seizures we turn next to whether the evidence itself must be suppressed. We find the officer did not reasonably

---

[15] Officer Yost's radio worked sufficiently well that night for him to reach dispatch to request a phlebotomist.

16

rely on section 23612, subdivision (a)(5) and that the good-faith exception to the exclusionary rule does not apply.

" '[E]vidence should be suppressed "only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." ' " (*Herring v. United States* (2009) 555 U.S. 135, 143 (*Herring*).) The good-faith exception to the exclusionary rule asks whether a reasonably well-trained officer would have known the search was illegal in light of all the circumstances. (*Id.* at p. 145.) This is "an objective" standard that "requires officers to have a reasonable knowledge of what the law prohibits." (*United States v. Leon* (1984) 468 U.S. 897, 919, fn. 20.) "Police officers are presumed to know the law, particularly those laws that relate to the performance of their duties." (*People v. Rosas* (2020) 50 Cal.App.5th 17, 25.)

For the last decade, it has been settled that absent some exception, the Fourth Amendment requires a warrant for a blood draw. (*McNeely*, *supra*, 569 U.S. at p. 148.) "[A] warrantless search of the  person is reasonable only if it falls within a recognized exception," and this principle applies to the "invasion of bodily integrity" implicated by a blood draw. (*Ibid*.) A warrant is required even for a blood draw incident to arrest. (*Birchfield*, *supra*, (2016) 579 U.S. at pp. 474–476.) Any reasonably well-trained officer would have known this in 2018, when the events at issue here took place.

One exception to the Fourth Amendment's warrant requirement is consent. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219.) To establish this exception, the state must prove that the consent was freely and voluntarily given. (*Bumper v. North Carolina* (1968) 391 U.S. 543, 548.) Thus, no warrant is required for a blood draw if the suspect gives actual

17

consent freely and voluntarily. (*People v. Harris* (2015) 234 Cal.App.4th 671, 682 (*Harris*).)

At the suppression hearing, Officer Yost stated "[m]y belief was that if [a driver] were unconscious, I could—it was—I could draw the blood, and under the Vehicle Code or DMV [Department of Motor Vehicles] Code, that they had given consent." Thus, the People argue Officer Yost relied in good faith on California's implied consent statute, which allowed him to take a warrantless blood draw due to Alvarez's unconsciousness.

The implied consent law states that any driver of a motor vehicle is "deemed to have given his or her consent" to blood or breath testing for alcohol and drugs upon lawful arrest for driving under the influence. (§ 23612, subd. (a)(1)(A) & (B).) The officer must advise the driver that failure to submit to the required testing will result in a fine and mandatory imprisonment if convicted of driving under the influence, as well as administrative suspension or revocation of driving privileges. (*Id.*, subd. (a)(1)(D).) The officer must also advise the person "that, in the event of refusal to submit to a test or tests, the refusal may be used against him or her in a court of law." (*Id.*, subd. (a)(4).) An unconscious or incapacitated person is "deemed not to have withdrawn his or her consent" and a blood or breath test may therefore be administered without giving any admonition about loss of driving privileges. (*Id.*, subd. (a)(5).) In a subsequent prosecution for driving under the influence, the court may also admit into evidence a driver's refusal to submit to such a test to show consciousness of guilt. (*People v. Municipal Court* (*Gonzales*) (1982) 137 Cal.App.3d 114, 117–119; CALCRIM No. 2130.)

It was not objectively reasonable for Officer Yost to believe that the implied consent law even applied here. (§ 23612.) The only two subdivisions

18

of the statute deeming drivers to have given their consent to a blood draw are subdivisions (a)(1)(A) and (B), both of which apply only if the driver is "lawfully arrested for an offense allegedly committed in violation of Section 23140, 23152, or 213153." Section 23612, subdivision (a)(1)(C) further states that "[t]he testing shall be incidental to a lawful arrest . . . ." By its plain language, therefore, the implied consent law applies only if the person has been lawfully arrested for one of the listed offenses. (See *People v. Superior Court* (*Hawkins*) (1972) 6 Cal.3d 757, 765 ["the Legislature took pains to condition its use upon a lawful arrest for driving under the influence . . . ."].)

Two California appellate court cases have found that a blood sample may be obtained from a driver even in the absence of an actual arrest. (*People v. Trotman* (1989) 214 Cal.App.3d 430, 435; *People v. Deltoro* (1989) 214 Cal.App.3d 1417, 1425; accord, *United States v. Chapel* (9th Cir. 1995) 55 F.3d 1416, 1419.) As the *Trotman* court explained, "[t]he rationale of both *Schmerber* and *Cupp* [*v. Murphy* (1973) 412 U.S. 291], makes it clear that probable cause to arrest a defendant is the constitutional equivalent of an actual arrest for the limited purpose of determining blood alcohol content." (*Trotman*, at pp. 437–438.) Thus, "a formal arrest is not a precondition to the warrantless extraction of blood so long as probable cause exists to believe that the defendant was driving under the influence and that an analysis of the sample will yield evidence of that crime." (*Id*. at p. 437.)

Alvarez was not arrested for any offense at the time of the blood draw, and the officer had made no decision to arrest him. Officer Yost had not yet determined who was at fault in the collision. Nor did probable cause exist to support the warrantless blood draw. We look to the totality of the circumstances to determine whether probable cause exists. (*Illinois v. Gates* (1983) 462 U.S. 213, 238.)

19

Even after administering the HGN field sobriety test and the preliminary alcohol screening test at the hospital, Officer Yost still "wasn't sure if [Alvarez] was even under the influence . . . at the time of the collision." Officer Yost never formed the opinion that Alvarez was under the influence. As the trial court concluded, "it's clear now that [Officer Yost] had no belief as it relates to th[is] guy being responsible for the accident," and although the breath test disclosed that Alvarez had "some alcohol in his system" at the hospital, Officer Yost was "unsure as to where it would place him at the time of the accident." This record does not support the conclusion that Officer Yost had probable cause to arrest Alvarez for driving under the influence of alcohol at the time the blood sample was taken. Accordingly, the implied consent law does not apply.

Even if the implied consent statute applied, the People cited no authority that would have given an officer an objectively reasonable basis to believe that mere implied consent under section 23612 was sufficient for a warrantless blood draw under the Fourth Amendment. The existing case law as of the time of the search in March 2018 was to the contrary (as it remains now). (See, e.g., *Harris*, *supra*, 234 Cal.App.4th at pp. 682, 689 [for warrantless blood draw under implied consent statute, Fourth Amendment requires "actual consent" that is "freely and voluntarily given"]; *id*. at p. 686 ["rather than determine whether 'implied consent' to a chemical test satisfies the Fourth Amendment, we must determine whether submission to a chemical test, after advisement under the implied consent law, is freely and voluntarily given and constitutes *actual* consent"]; *id*. at p. 689 ["we must determine whether defendant's submission in this case was freely and voluntarily given under the normal totality of the circumstances analysis"]; *People v. Mason* (2016) 8 Cal.App.5th Supp. 11, 19–33, 31 ["To recap, we have

20

concluded that advance 'deemed' consent under the implied consent law cannot be considered actual Fourth Amendment consent"]; *People v. Ling* (2017) 15 Cal.App.5th Supp. 1, 3–5, 10–11 [lawfulness of consent to blood draw post-*McNeely* "will be based on a consideration of the totality of all the circumstances"].)  No California court after *McNeely* has held that the implied consent statute is sufficient by itself to justify a warrantless blood draw under the Fourth Amendment.

By March 2018, numerous courts in other jurisdictions with similar implied consent laws had reached the same result as these California cases. (See, e.g., *State v. Romano* (N.C. 2017) 369 N.C. 678 [800 S.E.2d 644, 652–653] [implied consent statute "does not create a per se exception to the warrant requirement" under Fourth Amendment]; *Williams v. State* (Ga. 2015) 296 Ga. 817 [771 S.E.2d 373, 377] ["[M]ere compliance with statutory implied consent requirements does not, per se, equate to actual, and therefore voluntary, consent on the part of the suspect so as to be an exception to the constitutional mandate of a warrant"]; *State v. Yong Shik Won* (Hawaii 2015) 137 Hawaii 330 [372 P.3d 1065, 1080] ["in order to legitimize submission to a warrantless BAC test under the consent exception, consent may not be predetermined by statute, but rather it must be concluded that, under the totality of the circumstances, consent was in fact freely and voluntarily given"]; *Commonwealth v. Myers* (Pa. 2017) 640 Pa. 653 [164 A.3d 1162, 1173] ["In recent years, a multitude of courts in our sister states have interpreted their respective—and similar—implied consent provisions and have concluded that the legislative proclamation that motorists are deemed to have consented to chemical tests is insufficient to establish the voluntariness of consent that is necessary to serve as an exception to the warrant requirement"]; *Byars v. State* (Nev. 2014) 130 Nev. 848 [336 P.3d

21

939, 946] [holding Nevada's implied consent statute that permitted law enforcement to use force to obtain a sample and did not give the individual the right to withdraw consent could not be considered voluntary consent under the consent exception]; *State v. Wulff* (Idaho 2014) 157 Idaho 416 [337 P.3d 575, 581] ["[I]rrevocable implied consent operates as a per se rule that cannot fit under the consent exception because it does not always analyze the voluntariness of that consent"]; *State v. Butler* (Ariz. 2013) 232 Ariz. 84 [302 P.3d 609, 613] [holding the Fourth Amendment requires consent to be voluntary and independent of an implied consent statute]; *State v. Modlin* (Neb. 2015) 291 Neb. 660 [867 N.W.2d 609, 621] [holding actual voluntary consent is required for a warrantless blood test to be reasonable and the proper inquiry is the totality of the circumstances, "one of which is the implied consent statute"]; *Flonory v. State* (Del. 2015) 109 A.3d 1060, 1065 [mere statutory implied consent to warrantless blood draw is insufficient to satisfy Fourth Amendment].)

As these cases recognize, treating the implied consent statute as a per se exception to the warrant requirement would conflict with precedents of the United States Supreme Court. In *McNeely*, *supra*, 569 U.S. 141, the Supreme Court spoke disapprovingly of per se exceptions to the warrant requirement in the context of a warrantless blood test. (*Id.* at p. 143 ["the Fourth Amendment will not tolerate adoption of an overly broad categorical approach in this context"].) In *Birchfield*, *supra*, 579 U.S. 438, which involved three petitioners who each suffered a criminal conviction or suspension of a driver's license under a state's implied consent law, the Supreme Court confirmed that a blood test may *not* be administered without a warrant as a search incident to arrest (*id.* at pp. 474–476), and specifically noted that if the driver was unconscious, "the police may apply for a warrant

22

if need be." (*Id*. at p. 475.)  As the Court noted:  "Nothing prevents the police from seeking a warrant for a blood test when there is sufficient time to do so in the particular circumstances . . . ."  (*Id*. at pp. 474–475.)  *Birchfield* also stated:  "There must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads."  (*Id*. at p. 441.)  Moreover, for one of the *Birchfield* petitioners who submitted to a blood test under an implied consent law and then had his license suspended for driving under the influence, the Court remanded for a determination whether the consent was voluntary under the usual Fourth Amendment totality of circumstances standard.  (*Id*. at pp. 453, 478.)

Taken together, "the reasoning and analysis in *Birchfield* and *McNeely*, as well as other Fourth Amendment precedent, suggest that blood draws may only be performed after either obtaining a warrant, obtaining valid consent from the defendant, or under exigent circumstances with probable cause." (*State v. Romano*, *supra*, 800 S.E.2d at p. 653; see also *Commonwealth v. Dennis* (2019) 96 Mass.App.Ct. 528, 535–536 [135 N.E.3d 1070, 1078] [concluding under *Birchfield* that "the defendant's actual consent to a blood test must be 'voluntary' under the Fourth Amendment"]; *Commonwealth v. Myers*, *supra*, 164 A.3d at p. 1178 ["The *Birchfield* Court's application of its holding further supports the conclusion that, despite the existence of an implied consent provision, an individual must give actual, voluntary consent at the time that testing is requested"]; *State v. Vargas* (N.M. 2017) 2017-NMSC-029, ¶ 22 [404 P.3d 416, 422] [holding that after *Birchfield*, "[i]mplied consent laws can no longer provide that a driver impliedly consents to a blood draw"]; *State v. German* (S.C. 2023) 439 S.C. 449, 467 [887 S.E.2d 912, 921] ["we recognize an implied consent statute cannot allow what the Fourth Amendment prohibits"—thus, a warrantless blood draw "requires a finding

that consent be given voluntarily under the totality of the circumstances" and "a valid finding of consent requires a suspect to be able to refuse or revoke consent"].)

Even the prosecutor below conceded that when the motion to suppress was filed in November 2018, "I could not have come in and said this was a statutory consent case . . . ." This explains why the prosecution originally did not oppose the motion. But if the implied consent law was not even an arguable basis for opposing the suppression motion, one wonders how it could have been an objectively reasonable basis for ordering a warrantless blood draw.

Finally, "[i]t needs no citation of authorities to state that an unconscious man is incapable of giving consent." (*Carrington v. Superior Court* (1973) 31 Cal.App.3d 635, 641.) The trial court concluded that Alvarez was unconscious based on the testimony that his eyes were closed, he appeared to Officer Yost to be unconscious or unresponsive, he was not answering questions, and he had no physical response when his blood was drawn. Even for a conscious driver subject to an implied consent law, the Fourth Amendment demands that the driver have a choice between (1) giving *actual* consent or (2) refusing to give actual consent and accepting the consequences of the implied consent law, which include forfeiture of driving privileges. (*Harris*, *supra*, 234 Cal.App.4th at p. 686.) An unconscious person cannot possibly exercise such a choice. To pretend that an unconscious person consented to a search based solely on a statutory legal fiction is objectively unreasonable under settled Fourth Amendment law requiring the existence of actual consent given freely and voluntarily.

Under existing authority, a reasonably well-trained officer would have known the search was illegal in light of all the circumstances. (*Herring*,

24

*supra*, 555 U.S. at p. 145.)  Thus, we conclude Officer Yost did not reasonably rely on the implied consent law of section 23612 to justify the warrantless blood draw and that the good-faith exception to the exclusionary rule does not apply.

DISPOSITION

The judgment is reversed.  The matter is remanded with instructions to (1) vacate its order denying Alvarez's suppression motion and enter a new order granting the motion; (2) permit Alvarez to withdraw his guilty plea by appropriate motion within 30 days after this opinion becomes final; (3) determine whether the People intend to retry the case; and (4) make such other orders as are necessary and appropriate.


                                        HUFFMAN, Acting P. J.

WE CONCUR:


BUCHANAN, J.


CASTILLO, J.