Filed 11/19/25  P. v. McGruder CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B335512 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. XWESA107741 |
| v. | |
| DEANDRE DORELL McGRUDER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph J. Burghardt, Judge.  Affirmed.

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

A jury convicted Deandre Dorell McGruder of attempted murder and several firearm-related offenses, including unlawful possession of a firearm and ammunition by a felon. At trial, the People presented evidence that McGruder was upset with the victim because he refused to open a sandwich shop that was closed for the evening. McGruder confronted the victim in the parking lot as he was walking to his car to go home for the night. McGruder fired at least five shots at the victim from close range, none of which struck the intended target. The victim identified McGruder in a photographic lineup and at trial. The jury convicted McGruder as charged, and the court sentenced him to a life term with the possibility of parole plus 10 years.

On appeal, McGruder contends the record lacks sufficient evidence to support his conviction for attempted murder, the trial court should have suppressed evidence found during a warrantless search of his van, and California's laws prohibiting felons from possessing firearms and ammunition violate the Second Amendment to the United States Constitution. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1. *The charges*

The People charged McGruder with willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 664, subd. (a), 187, subd. (a)),[1] shooting at an occupied motor vehicle (§ 246), shooting from a motor vehicle (§ 26100, subd. (c)), assault with a firearm (§ 245, subd. (a)(2)), possession of a firearm by a felon (§ 29800, subd. (a)(1)), and possession of ammunition by a felon (§ 30305, subd. (a)(1)). The People alleged various firearm

---

[1] Statutory references are to the Penal Code.

2

enhancements and aggravating circumstances. The People also alleged McGruder has a prior conviction that qualifies as a strike under the Three Strikes law.

**2.** ***The People's case***

At trial, the People presented testimony from Michael Scott. Scott testified that he was working at a sandwich shop on August 1, 2022. The shop normally closed at 10:00 p.m. However, Scott was the only employee working that night, so he closed the restaurant at 9:00 p.m.

Around 9:50 p.m., a white van pulled into the parking lot. A man—whom Scott later identified as McGruder—got out of the van and walked up to the restaurant. The man "bang[ed]" on the restaurant's door—which was locked—and asked Scott to let him inside so he could order a sandwich. Scott responded that he could not open the door because the restaurant was closed for the night. The man continued banging on the door, and he became more upset after noticing a sign stating the restaurant is open until 10:00 p.m.

The man eventually went back to his van, where he sat for a few minutes before driving away. Scott thought nothing of the encounter and went back to work closing the shop.

The last task Scott had to complete before going home was to take out the trash. Scott locked up the restaurant and started walking across the parking lot to the dumpster. On his way, Scott noticed the man from the earlier encounter leaving a nearby store. Scott dropped off the trash and headed towards his car to go home.

As Scott was walking to his car, a white van drove up close to him. It was the same van that had been parked outside the restaurant earlier that evening. Scott could not see the driver's

3

face because it was dark inside the van.  The driver referred to Scott using offensive language and asked if he was the person who " 'didn't let me in the' " restaurant.  Scott said he was sorry, but he had to close the restaurant early and there was nothing he could do.  Scott believed it was the same person whom he encountered earlier that night, based on the van, the man's voice, and his "approach."

The van drove away, and Scott continued to his car.  Moments later, the van turned around and headed back towards Scott.  The van stopped about five feet from Scott, who was now standing next to his own car.

Someone inside the van started shooting a gun in Scott's direction.  Scott was able to get inside his car and shut the door.  He ducked under the steering wheel until the gunshots stopped and he heard the van drive away.  Scott sat up, started his car, and drove away.  He eventually went home and called 911.

Scott noticed several bullet holes on the driver's side of his car, and one of its rear windows was shattered.  Sheriff's deputies later removed four expended bullets from the car.  They found five shell casings in the parking lot where the shooting took place.

On August 11, 2022, a deputy presented Scott with a six-person photographic lineup, which included a picture of McGruder.  The deputy who presented the lineup did not know whether it contained a photograph of a potential suspect.  Scott recognized McGruder's photograph "right off the bat."  After taking a minute to study the other photographs, Scott circled McGruder's picture and wrote, "His nose and eyes and his mustache resemble the person that committed this crime." At trial, the prosecutor asked Scott, "[D]id you pick that

photograph because you believed it was the person or someone that just resembled the person that committed the crime?" Scott responded, "Because I believed it was the person."

Scott identified McGruder at the preliminary hearing and at trial as the man he saw outside the restaurant on August 1, 2022. Scott said he got a "good look" at McGruder's face when he was banging on the restaurant door.

During Scott's testimony, the prosecutor played for the jury videos taken by surveillance cameras pointed at the parking lot. Scott had not watched the videos before trial. The videos showed the man Scott identified as McGruder wearing dark Adidas shoes and driving a white van.

About a month after the shooting—on August 29, 2022—police officer Ricardo Leon responded to a radio call of an assault with a deadly weapon. Leon arrived at the scene of the shooting and noticed McGruder trying to drive away in a white van. McGruder was nervous, "sweating profusely," and bleeding. The officer arrested McGruder and searched his van. Inside the van, the officer found an identification card with McGruder's name.

A detective obtained a warrant and searched McGruder's van two days later, on August 31, 2022. During the second search, the detective found dark Adidas shoes, a wallet, and five forms of identification bearing McGruder's name.

The parties stipulated that McGruder did not access the van between the two searches. They also stipulated that McGruder was prohibited from possessing a firearm on August 1, 2022, the police did not find any firearms related to this case, and McGruder was the only victim of the shooting on August 29, 2022.

### 3. *McGruder's defense*

McGruder testified in his own defense. McGruder could not recall where he was the night of the shooting. However, he denied that he was the person who tried to shoot Scott. On cross examination, McGruder agreed he and the man in the surveillance videos physically resemble one another, have tattoos on the same places on their arms, and had matching shoes. McGruder also agreed the white van in the surveillance videos resembles his own van.

McGruder presented expert testimony from Dr. Mitchell Eisen, who is a professor of psychology. Dr. Eisen testified to the limits of human memory and attention, particularly as applied to eyewitness identifications. Dr. Eisen told the jury eyewitness identifications are an important component of the criminal justice system, but they present significant reliability problems. He discussed factors that affect the reliability of an eyewitness's identification, including trauma, "exposure duration," the passage of time, and suggestion. According to Dr. Eisen, the most accurate identifications typically occur when a witness—without suggestion—looks at a photographic lineup and has an instant and powerful recognition of the suspect.

### 4. *The verdict and sentencing*

The jury found McGruder guilty as charged and found the enhancements true. After the jury returned its verdicts, McGruder stipulated that there are sufficient aggravating circumstances to justify an upper term sentence.[2]

---

[2] McGruder agreed to stipulate to the aggravating circumstances on the condition that the court not sentence him under the Three Strikes law.

The court sentenced McGruder to life with the possibility of parole for premeditated attempted murder, plus a determinate term of 10 years for the firearm enhancement (§ 12022.5, subd. (a)). The court imposed terms on the other counts, which it stayed under section 654.

McGruder timely appealed.

## DISCUSSION

### 1. *Substantial evidence supports McGruder's conviction for attempted murder*

McGruder contends there is insufficient evidence supporting his conviction for attempted murder.

In reviewing a conviction challenged for insufficient evidence, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104; *People v. Salazar* (2016) 63 Cal.4th 214, 242.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*); *People v. Booker* (2011) 51 Cal.4th 141, 173.)

It is the exclusive province of the jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends and, if substantial evidence supports the verdict, we accord due deference to the trier of fact. (*Smith, supra*, 37 Cal.4th at p. 739.) Reversal is not warranted unless it appears " ' " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " ' "

7

(*People v. Penunuri* (2018) 5 Cal.5th 126, 142; *People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Here, substantial evidence supports McGruder's conviction for attempted murder. It is undisputed that, the night of August 1, 2022, a man driving a white van attempted to kill Scott by firing at least five gunshots at him from close range. The only significant issue in dispute at trial was the shooter's identity.

There is substantial evidence in the record from which a reasonable juror could conclude McGruder was the shooter. At the preliminary hearing and at trial, Scott identified McGruder as the man driving the white van. Scott also identified McGruder in a photographic lineup a few days after the shooting. Scott testified that he recognized McGruder "right off the bat." According to McGruder's expert, an eyewitness's "immediate confident recognition . . . tends to be associated with accuracy."

Surveillance videos of the shooter supported Scott's identification of McGruder. The videos showed the shooter shared McGruder's facial features, hair, and tattoos. McGruder also owned a white van and dark shoes that matched the shooter's van and shoes, as seen in the surveillance videos. On this record, the jury reasonably could have determined Scott's identification was accurate and McGruder committed the attempted murder.

McGruder argues Scott's identification lacks probative value and does not constitute substantial evidence of his guilt. According to McGruder, many of the factors his expert identified as negatively affecting the accuracy of an eyewitness's identification are present here. McGruder points to Scott's testimony that his interactions with the shooter were brief and took place in the dark, he tried to avoid looking directly

8

at the shooter, and the incident was traumatizing.  McGruder also notes that, in a 911 call and at the preliminary hearing, Scott gave inaccurate descriptions of the shooter's hair, facial hair, clothing, and tattoos.

Despite McGruder's insistence otherwise, his arguments are little more than veiled attempts to have us reweigh the evidence.  None of the circumstances McGruder identifies renders Scott's identification physically impossible or inherently improbable.  (See *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction"]; Evid. Code, § 411 ["the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact"].)   Nor is there a requirement that an eyewitness's recollection be entirely accurate to be reliable.  (See *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1188 [approving standard jury instruction admonishing jurors not to reject testimony automatically " 'just because of inconsistencies or conflicts' "].) The jury was capable of deciding what weight to give Scott's testimony in light of the circumstances surrounding his interactions with the shooter, the discrepancies in his descriptions, and the expert testimony concerning the limits of memory and eyewitness identifications.  We will not second guess the jury's conclusions on appeal.  It is enough that Scott's testimony, when considered with the other evidence in the record, was sufficiently reasonable, credible, and of solid value to support a conviction for attempted murder.  (See *People v. Cuevas* (1995) 12 Cal.4th 252, 260 [substantial evidence is " 'evidence which is reasonable, credible, and of solid value' "].)

The record does not support McGruder's contention that Scott's identification is unreliable because he never got "a good look" at the shooter. McGruder points to an exchange at trial when defense counsel asked Scott, "[Y]ou said that you never got a very good look at the guy; right?" Scott replied, "Not really, no." Scott's answer contains a double negative, rendering it ambiguous. Moreover, Scott unambiguously testified on direct examination that he got "a good look at [the shooter's] face" during their first encounter. On review for substantial evidence, we must view the record in the light most favorable to the prosecution. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Applying that standard to Scott's testimony, we reject McGruder's contention that the record shows Scott never got a good look at the shooter.

We also reject McGruder's passing suggestions that the identification process was overly suggestive. McGruder notes the police did not videotape the identification procedure—as required under section 859.7—or record every conversation with Scott concerning the photographic lineup. He also notes suggestibility can be subtle, and it may persist even after an admonition. None of the circumstances McGruder identifies render Scott's identification unreliable as a matter of law. The jury was fully capable of considering the circumstances when determining what weight to give Scott's identification.

## 2. *The trial court's denial of McGruder's suppression motion was harmless*

McGruder argues the trial court erred by denying his motion to suppress evidence found during the August 29, 2022 warrantless search of his van.

10

a.     *Background*

Before trial, McGruder moved to suppress evidence from the first search of his van, which the police conducted without a warrant on August 29, 2022.  McGruder argued the police lacked probable cause for the search, rendering it unlawful.  He asked the court to suppress evidence the officers found inside the van, as well as videos from the officers' body-worn cameras.  McGruder did not move to suppress evidence obtained during the second search of the van.

One of the officers who conducted the search, Ricardo Leon, testified at the suppression hearing.  Leon testified that, on August 29, 2022, he and his partner responded to a report of a shooting at a residence.  When the officers arrived at the residence, McGruder was trying to drive away in a white van.  McGruder got out of the van when he noticed the officers.  He was nervous, sweating profusely, and bleeding.  The officers detained McGruder.

According to Leon, a man named Michael told the officers McGruder had pointed at gun at him during an argument.  After the argument ended, McGruder accidentally shot himself in the leg.  McGruder gave Michael the gun and told him to hide it.  The officers searched the residence and found a gun under a mattress.

Leon testified that, after speaking with Michael and searching the house, he arrested McGruder and decided to search his van "based on the totality of the circumstances and all the other evidence that we already had recovered."  Leon described the search as a "protective sweep" to look for victims, suspects, and weapons.  Leon also wanted to determine if the van belonged to McGruder, "because we were going to leave [the van] at the

11

residence based on what [McGruder] had requested. So we were looking for any information or any keys that would tie that van to [McGruder]." Inside the van, Leon found a wallet containing McGruder's identification card.

The court denied the motion to suppress. The court concluded, based on the totality of the circumstances, the police had probable cause to search the van. The court noted the officers responded to a report of an assault with a deadly weapon, identified McGruder as a possible suspect, and noticed McGruder was nervous, sweating profusely, and bleeding.

At trial, the prosecutor played for the jury video of the first search captured by Officer Leon's body-worn camera. The video showed Leon finding a wallet that contained an identification card. Leon testified the identification card belonged to McGruder.

The prosecutor also presented evidence that, during a second search of the van two days later, a detective found dark Adidas shoes and a wallet. Inside the wallet, the officer found an insurance card with McGruder's name. The officer also found a vehicle registration card, AAA card, medical insurance card, and tax registration certificate, all bearing McGruder's name.

b.    *Analysis*

The Fourth Amendment prohibits "unreasonable searches and seizures." (U.S. Const., 4th Amend.) A defendant may move to suppress evidence "obtained as a result of a search" on the ground that the search without a warrant was unreasonable. (§ 1538.5, subd. (a)(1)(A).) A warrantless search is presumed to be unreasonable, and the prosecution bears the burden of demonstrating a legal justification for the search. (*People v. Redd* (2010) 48 Cal.4th 691, 719.) The "fruit of the poisonous tree"

12

doctrine prohibits the introduction of evidence causally connected to an unlawful search. (*People v. Navarro* (2006) 138 Cal.App.4th 146, 157, fn. 6.)

We need not decide whether the August 29, 2022 search was unreasonable because, even assuming it was, any error in denying McGruder's suppression motion was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Tewksbury* (1976) 15 Cal.3d 953, 972 (*Tewksbury*).) McGruder asserts the evidence found during the first search was crucial to the People's case because it tied him to a van that resembled the one used in the shooting. He suggests admission of that evidence was particularly prejudicial because the primary disputed issue at trial was the identity of the shooter.[3]

While we agree the evidence obtained during the first search was incriminating, we do not agree its introduction was prejudicial. McGruder's identification card was the only evidence found during the first search that tied him to the van. Even without that card, the jury heard overwhelming evidence that the van belonged to McGruder, to the point that the issue was not seriously in dispute at trial. Officer Leon testified that he saw McGruder driving the van on August 29, 2022. The prosecutor also presented undisputed evidence that, during the second search on August 31, 2022, the police found five

---

[3] On appeal, McGruder does not argue the video of the search taken by the officer's body-worn camera was incriminating or otherwise prejudicial. Therefore, we do not consider that issue. (See *People v. Spector* (2011) 194 Cal.App.4th 1335, 1372, fn. 12 (*Spector*) [declining to address issue not raised in appellant's opening brief].)

13

documents bearing McGruder's name. To the extent there was still doubt about the van's ownership, McGruder testified that it belonged to him. On this record, there is no question the jury would have concluded the van belonged to McGruder, even without the evidence found during the first search. Accordingly, any error in failing to suppress that evidence was harmless beyond a reasonable doubt. (See *Tewksbury, supra*, 15 Cal.3d at p. 972 [any error in not suppressing evidence of a gun was harmless where other evidence of guilt was overwhelming]; *People v. Meza* (2018) 23 Cal.App.5th 604, 612–613 [erroneous failure to suppress evidence of a blood draw was harmless where a different blood draw showed the defendant's blood alcohol content was well above the legal limit].)

McGruder suggests the court also should have suppressed evidence found during the second search. According to McGruder, the discovery of his identification card during the first search caused the police to impound the van and obtain a warrant to conduct the second search. Therefore, he argues, any evidence found during the second search was tainted by the unlawful first search and should have been excluded.

McGruder forfeited this issue by failing to raise it below. In his motion to suppress, McGruder sought to exclude only evidence obtained during the first search. He did not challenge the legality of the second search or otherwise seek to suppress any evidence obtained during it. By failing to do so, McGruder forfeited any argument that the trial court should have excluded evidence found during the second search. (See *People v. Lilienthal* (1978) 22 Cal.3d 891, 896 ["it would be wholly inappropriate to reverse a superior court's judgment for error it did not commit and that was never called to its attention"];

14

*People v. Partida* (2005) 37 Cal.4th 428, 435 [a "party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct"].)

3.     *California's laws prohibiting felons from possessing firearms and ammunition do not violate the Second Amendment*

McGruder argues his convictions for unlawful possession of a firearm and ammunition must be reversed because the underlying statutes violate the Second Amendment to the United States Constitution.

The People charged McGruder with violating sections 29800, subdivision (a)(1), and 30305, subdivision (a)(1). Section 29800, states, in relevant part, "[a]ny person who has been convicted of a felony . . . and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." (§ 29800, subd. (a)(1).) Section 30305 states, "[n]o person prohibited from owning or possessing a firearm under [section 29800] shall own, possess, or have under custody or control, any ammunition or reloaded ammunition." (§ 30305, subd. (a)(1).)

Before trial, McGruder filed a motion to dismiss both charges. McGruder asserted sections 29800 and 30305 violate the Second Amendment as applied to the states through the Fourteenth Amendment. McGruder also argued the charges should be dismissed because they relied on his prior felony conviction for carrying a gun in public, which itself violates the Second Amendment. The trial court denied the motion, and the jury convicted McGruder of both offenses.

15

In the trial court, McGruder made both a facial and an "as-applied" challenge to sections 29800 and 30305. On appeal, he focuses on the facial challenge and does not meaningfully address the as-applied challenge.[4] A facial challenge "is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the [statute] would be valid.' [Citation.] That means that to prevail, the Government need only demonstrate that [the statute] is constitutional in some of its applications." (*United States v. Rahimi* (2024) 602 U.S. 680, 693 (*Rahimi*).)

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." (U.S. Const., 2d Amend.) In *District of Columbia v. Heller* (2008) 554 U.S. 570, the United States Supreme Court held the "Second Amendment conferred an individual right to keep and bear arms," which "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." (*Id.* at pp. 595, 635.) Two years later, the Supreme Court held the Second Amendment is "fully applicable to the States" under the Fourteenth Amendment. (*McDonald v. City of Chicago, Ill.* (2010) 561 U.S. 742, 750, 791.)

In *New York State Rifle & Pistol Association, Inc. v. Bruen* (2022) 597 U.S. 1 (*Bruen*), the Supreme Court clarified the "standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that

---

[4] McGruder's failure meaningfully to address the as-applied challenge on appeal forfeits the issue. (See *Spector, supra*, 194 Cal.App.4th at p. 1372, fn. 12.)

conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." (*Id.* at p. 24.) The court explained the historical inquiry "will often involve reasoning by analogy," and "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" (*Id.* at pp. 28–29.)

In *Rahimi, supra*, 602 U.S. 680, the Supreme Court applied the *Bruen* framework and upheld a federal statute prohibiting individuals subject to domestic violence restraining orders from possessing firearms. The court explained "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." (*Rahimi*, at pp. 691–692.) The court reiterated that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition," and "[w]hy and how the regulation burdens the right are central to this inquiry." (*Id.* at p. 692.)

California courts have unanimously held sections 29800 and 30305 do not violate the Second Amendment, but they have given different reasons for doing so. The majority of courts have concluded the Second Amendment's plain text does not apply to convicted felons. (See *People v. Richardson* (2025) 108 Cal.App.5th 1203, 1207; *People v. Ceja* (2023) 94 Cal.App.5th 1296, 1300–1302; *People v. Odell* (2023) 92 Cal.App.5th 307, 309, 316–317; *People v. Alexander* (2023) 91 Cal.App.5th 469, 479.) In *Alexander*, for example, the court explained that "*Heller*

17

and *Bruen* both held that the Second Amendment protects the individual right of ' "law-abiding, responsible citizens" ' to possess firearms. [Citations.] Convicted felons, by definition, are not law abiding. Felons thus are not among 'the people' who have an individual right to possess firearms under the Second Amendment. (U.S. Const., 2d Amend.) . . . [Therefore,] challenges to the constitutionality of section 29800(a)(1) and section 30305(a)(1) under the Second Amendment fail under the first step of *Bruen*'s analytical framework." (*Alexander*, at p. 479.)

A minority of California courts have proceeded to the second step of the *Bruen* framework. (See *People v. Anderson* (2024) 104 Cal.App.5th 577, 582 (*Anderson*); *People v. Gomez* (2025) 110 Cal.App.5th 419, 425; *People v. Bey* (2025) 108 Cal.App.5th 144, 162.) In *Anderson*, for example, the court determined felons are among " 'the people' " whose rights the Second Amendment protects. (*Anderson*, at pp. 588–589.) Nevertheless, after conducting a detailed historical survey of "sources from 17th-Century England, colonial America, and the early federal period," the court concluded sections 29800 and 30305 pass constitutional muster. (*Id.* at pp. 589, 599–600.)

The *Anderson* court employed a "thematic" approach to determine whether California's statutes are consistent with the nation's historical tradition of firearm regulation. (*Anderson, supra*, 104 Cal.App.5th at p. 597.) The court identified three categories of historical evidence that are " 'relevantly similar' " to sections 29800 and 30305: (1) "categorical disarmament laws, which prohibited categories of people from owning firearms based on their race, religion, or unwillingness to swear an oath of allegiance"; (2) "criminal penalties, whereby individuals were

18

disarmed as a consequence of their own criminal conduct"; and (3) Pennsylvania's and Massachusetts's "ratifying conventions' proposed constitutional provisions, which protected a right to arms that could be abrogated 'for crimes committed,' or upon evidence that a person posed a 'danger of public injury' or was not a 'peaceable citizen[ ].' " (*Anderson*, at pp. 597–599.) The court concluded, "[t]aken together, this historical evidence shows that individuals were disarmed as a preventative measure when the law assessed they were unwilling to respect sovereign authority, *and* they were disarmed as a sanction for criminal conduct, whether or not involving physical violence. California's felon disarmament measures are ' "relevantly similar" ' in serving both of these purposes." (*Id.* at p. 598.)

McGruder agrees with the *Anderson* court's conclusion that the Second Amendment applies to felons. However, he contends the court erred in concluding sections 29800 and 30305 are consistent with the historical tradition of firearm regulation. According to McGruder, the court's reasoning is flawed because it failed to identify a single historical analogue to California's statutes. Instead, the court bundled "distinct sets of historical evidence, each insufficient on its own to serve as a representative analogue."

Assuming, for the sake of argument, the Second Amendment applies to felons, we find the *Anderson* court's analysis of the historical record to be persuasive. Although the court did not identify any specific historical laws imposing lifetime disbarment on felons, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." (*Rahimi, supra*, 602 U.S. at pp. 691–692.) We agree with the *Anderson* court's determination that the

19

historical evidence demonstrates "this nation's tradition of firearm regulation allows for a categorical ban on the possession of firearms by persons who have been convicted of a felony." (*Anderson, supra*, 104 Cal.App.5th at p. 599; see *Bruen, supra*, 597 U.S. at p. 24 [a regulation that restricts the right to keep and bear arms survives scrutiny if it "is consistent with the Nation's historical tradition of firearm regulation"].) Accordingly, we agree with its conclusion that section 29800—and by extension section 30305—does not violate the Second Amendment. (See *Anderson*, at pp. 599–600.)

## DISPOSITION

We affirm the judgment.


## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



EGERTON, J.

We concur:



EDMON, P. J.



ADAMS, J.

20